ALEXANDER RIEGER, Appellant, v. LONDON GUARANTEE & ACCIDENT COMPANY OF LONDON, ENGLAND, Respondent.

Kansas City Court of Appeals, November 10, 1919.

1. **EMPLOYER'S LIABILITY INSURANCE: Employes Covered: Ejusdem Generis.** Where there are various clauses in a policy of employer's liability insurance relating to the employees to be covered by the policy it is not permissible to take merely one segment of the policy relating to the employees, and by the rule of *ejusdem generis* confine the scope of the policy to employees engaged in the work specifically named.

2. ———: **Construction of the Contract.** Where the meaning of an insurance contract is ambiguous the construction most favorable to the insured must be adopted; and hence a contract purporting, among other things, to cover injuries to *any* employee injured *through* the prosecution of certain described business operations, includes injuries to an employee of plaintiff engaged in delivering messages to the foreman in charge of the business operations described although said employee worked in the insured's office and was not otherwise connected with the prosecution of the business operations described.

3. ———: **Non-payment of Premium.** Although the wages paid by the plaintiff to the employee injured were not included in the total amount of wages on which the plaintiff's premium was based, yet this cannot be relied upon as a nonpayment of premium so as to defeat the insurance since the defendant had by the terms of the policy a year from the expiration of the contract in which to examine plaintiff's books and adjust the amount of premium, and was given full opportunity to examine said books and to fix the amount of premium due, and plaintiff merely paid without question or investigation what was demanded, in such case the defendant's failure to demand the extra amount is a waiver of such part of the premium.

4. ———: **Estoppel.** Where the defendant's agents on notification by plaintiff of an injury to an employee assured defendant they would take care of the matter and protect him, and defendant's adjuster and attorney took depositions of witnesses in preparation of the defense of the suit, and until a few weeks before the time for trial did not disclaim any liabilities under the policy, the plaintiff has raised an estoppel sufficient to take the case to the jury.

Appeal from Jackson Circuit Court.—*Hon. Willard P. Hall,* Judge.

Reversed and remanded.

*Samuel Epstein* and *J. C. Rosenberger* for appellant.

*Battle McCardle* for respondent.

TRIMBLE, J.—An action upon a policy of Employer's Liability Insurance. At the close of plaintiff's case in chief, the court sustained a demurrer to the evidence and directed a verdict for defendant. The plaintiff has appealed.

In its policy, defendant agreed: (1) That it would indemnify plaintiff against loss from liability for bodily injuries to employees, (to the limit of $5000 for one person); (2) that it would pay all cost and expense attendant upon the investigation, adjustment and settlement of claims arising out of such bodily injuries; (3) that if any claim was made on account of such injuries, or if any suit, even if groundless, should be brought against plaintiff to recover damages defendant would thereafter, in the name and on behalf of the plaintiff, but at its own cost and expense, either defend such claim or suit or settle the same as it might deem advisable; and (4) that it would pay all costs taxed against the plaintiff in legal proceedings which by its policy defendant was bound to defend.

The petition pleaded said policy and the above agreements and then set up that on June 20, 1916, while said policy was in force (it being from February 23, to August 23, 1916), Louise Miller, a young lady employee in plaintiff's wholesale and retail business in the building known as No. 1525-1527 Genesee street, Kansas City, Missouri, was injured by falling into a pit which had been recently dug in the floor of the shipping room in the basement of defendant's building preparatory to the installation therein of an elevator; that claim was made by her for damages on the ground that her injuries were caused by negligence in leaving the pit open, ungarded and insufficiently lighted; that notice of the accident and claim were promptly given the defendant herein and the latter took charge of the investigation and defense thereof; that afterward, on October 27, 1916, Miss Miller brought suit for $20,000 based on the negligence charged as above stated, asserting that her injuries were serious and permanent; that plaintiff herein immediately forwarded to defendant the petition and summons in said suit, and the defendant, through its own attorneys, took charge of the defense in the name of the plaintiff and continued in charge thereof until the said suit came regularly on for trial on the 14th of May, 1917, when

the defendant, in breach of its contract, denied it had issued any policy to plaintiff or was bound, by the policy it had issued, to defend said suit for plaintiff, or to settle same or to pay any adverse judgment, and refused to further defend said suit or to compromise or pay anything for compromise of same, or pay in whole or in part any adverse judgment which might be rendered therein against the plaintiff herein, and denied all liability to indemnify the plaintiff under said policy on account of such claim or suit, and abandoned the further defense thereof; that at the time of such abandonment and breach, the suit of Miss Miller was being called for trial by the court in which it was pending, the attorney for Miss Miller being present and demanding an immediate trial; that by reason of the conduct of defendant and the said breach of the contract of indemnity, plaintiff was obliged to, and did take over the defense of said Miller suit at his own cost and expense through his own attorneys employed for that purpose, who succeeded in getting a postponement of the trial of the said suit until May 23, 1917, to and on which date it was peremptorily set for trial by the court; that on the 22nd day of May, 1917, the plaintiff, after diligent investigation and inquiry, believing in good faith that the Miller suit could not be successfully defended, and compelled by the fear that a trial would result in a judgment against him in a much larger amount, and upon the advice of his counsel and in the exercise of reasonable prudence, compromised and settled it by paying Miss Miller $4900 in cash and the costs of suit. For this and other items of expense incurred in investigating, defending and adjusting said claim, the present suit is brought on the policy of Employer's Liability Insurance as aforesaid.

The answer, as it existed up until plaintiff closed his case, contained (1) a general denial, (2) a plea that the accident to Miss Miller did not occur "through the prosecution by the plaintiff of any business operation described or embraced" in the policy issued to plaintiff,

(3) a denial of prompt notice of the claim or of the suit of Miss Miller. When plaintiff's case was closed, defendant, over plaintiff's objection, amended its answer by inserting the allegation that "defendant avers that any wages paid by plaintiff to Louise Miller under her employment in the performance of her duties in the employ of Alexander Rieger, were not included in the amount upon which premium for such policy was paid by plaintiff, as required by the provisions of the policy, which was issued as stated in defendant's answer herein." A further amendment was also added, under the same circumstances, which alleged that if any moneys were paid out by plaintiff in compromise of the Miller suit or for expense, such payments were voluntary, were not authorzied by defendant, and were without defendant's written consent, which at no time was given.

Plaintiff, in his reply, set up an estoppel against defendant and charged that immediately after the happening of the accident to Miss Miller the defendant by its adjuster and attorneys took charge of the case, made an investigation of the premises of plaintiff, and inquired fully into the circumstances of the accident, into the status of Miss Miller, her duties, wages, and relationship to the business operations prosecuted by plaintiff at Numbers 1525-1527 Genesee street, and all the surrounding circumstances, and with full knowledge of such matters, continued in charge of such investigation and defense without raising any question of its duty under said policy to protect and indemnify plaintiff, and without intimating to or informing the plaintiff that it had any intention of refusing to indemnify plaintiff; that upon the filing of the Miller suit, the defendant took full charge of the defense of said suit and continued in full charge thereof until May 14, 1917, but that on May 9, 1917, defendant for the first time denied its liability under said policy, and, for the first time, raised any question of its liability to the plaintiff or of its duty to indemnify him, and thereafter on May 14, 1917, at the very hour the Miller suit was being called for trial, re-

fused to further conduct said defense, that at no time prior to May 9, 1917, did defendant advise plaintiff that it was claiming to have any alleged defense to any action which might be brought on the policy, nor did it claim that Miss Miller, or said accident and injuries, were not covered by said policy, but on the contrary at all times advised and assured plaintiff that it would fully protect and indemnify plaintiff against said accident, injuries, claim and suit, or any judgment which might be rendered thereon, and that by said conduct defendant had deceived and misled plaintiff to his great prejudice, and was, therefore, estopped to deny that the policy covered the said employee, accident or claim.

In sustaining the demurrer, the trial court did not put upon the record any reason for so doing, but it is manifest from the contest waged in the briefs that defendant's main contention is that the policy did not cover an employee of the kind or class to which Miss Miller belonged, but that it covered only those engaged in doing carpentry, masonry and other work plaintiff was having done in putting on a third story to the building and in installing an elevator therein. Plaintiff introduced evidence tending to show that due and prompt notice was given defendant, so that no claim can be made that want of notice furnished any foundation for the sustaining of the demurrer; nor do we understand that any contention of that character is now relied upon. It is of course elementary that, in considering the propriety of the demurrer, we must accept as true all the evidence which is legally admissible and has been properly offered by plaintiff in support of his claim. So the fact that defendant now claims it did not receive any notice of the accident prior to July 24, 1916, is wholly without force or effect in deciding the question now before us.

At the time in controversy, and for many years before that, the plaintiff, Alexander Rieger, was engaged in a wholesale and retail business under the firm name of J. Rieger & Company, which was simply a

trade name, he being the sole proprietor of the business. He was also the owner of the building located and having the street numbers as above set out. Plaintiff's business occupied the entire building, which, although having several street numbers, was merely one building with archways through the partitions so as to make the building one complete whole. He had a large number of employees consisting of clerical force, shipping clerks, porters, etc., which varied in number from twenty-five to one hundred and twenty-five persons according to the dullness or activity of the trade.

Shortly before the issuance of the policy sued on, plaintiff decided, for the better operation of his business, to add a third story to the building; to construct an elevator shaft from the shipping room in the basement of No. 1527 to the third story; to install therein an electric elevator; and to make miscellaneous changes and repairs. The construction of this elevator required the digging of a pit about three and one-half feet deep in the floor of the basement of No. 1527. It was contemplated that this work should go on without interruption of plaintiff's business; and the work was to be done, and was done, by plaintiff individually, without the intervention of any contractor, plaintiff himself buying all the necessary material, hiring and paying for the labor, and paying the cost of the work out of his own funds. Plaintiff had a man named Cole, who was and had been a regular employee of plaintiff on salary engaged in doing work of this kind on plaintiff's real estate holdings, and the details of the work to be done on the building were under this man as foreman. It was contemplated that much of the work would be done, and in fact a good deal of it was done, by the persons already in the employ of plaintiff in his business.

Before commencing this work, and in contemplation of it, plaintiff took out two policies of liability insurance issued to him by the defendant through the agents who countersigned the policies and the agents who solicited the insurance, collected the first or minimum

premium, and delivered the policies to the plaintiff. One policy covered injuries to *employees* and the other injuries to the *public,* or rather to persons who might be on the premises as members of the public in general, but who are not employees.

In the policy sued on, the indemnity agreement is stated as follows:

"The Company hereby agrees to indemnify the Assured herein named against loss from the liability imposed by law upon the Assured for damages on account of bodily injuries, including death resulting at any time therefrom, suffered by any employee or employees of the Assured, while at the places herein named, as the result of accidents occurring within the period herein stated through the prosecution of the business operations herein described."

The specific information as to who is the "assured" and who are the "employees" and what were "the business operations" referred to in the above paragraph, is found in section 4 of the policy called, "Schedule of Statements." A photographic copy of this portion of the policy was preserved in the abstract, which is difficult to reproduce in print, but it may be said that it consisted of a printed blank with "Items" numbered consecutively from 1 to 17 inclusive, the subject-matter of each item being set forth in print, with a blank thereafter for the insertion of the matter appropriate and applicable to the particular contract of insurance entered into. These blanks were filled in by defendant or its agents with a typewriter. Items 1, 2, and 3 were set forth as follows, the part in typewriting being shown in italics:

ITEM 1. Name of the Assured. *A. Rieger* Address *1525-27 Genesee Kansas City, Mo.* Individual, copartnership, corporation or estate. *Individual.*

"Item 2. The policy period shall be from *February 23, 1916* to *August 23, 1916,* at 12

o'clock noon, Standard time at assured's address as to each of said dates.

"Item 3.    The Company's liability on account of an accident resulting in bodily injuries or death to one person is limited to *Five Thousand* Dollars (*$5,000*), and subject to that limit for each person, the company's total lability on account of any one accident resulting in bodily injuries or death to more than one person is limited to *Ten Thousand* Dollars (*$10,000*)."

Thus it appears from Items 1 to 3 inclusive that A. Rieger, whom the evidence shows was Alexander Rieger, was the person insured, that he is described as an individual, that the policy period was to be from February 23, 1916, to August 23, 1916, and the Company's liability on account of an accident to one person was limited to $5,000.

In Item 4, in the column on the left, headed "Places where work is to be done" there is written in typewriting "1525-27, Genesee St., Kansas City, Mo.." And in the column headed "Nature of operations Insured" appears the word *"carpentry"* on one line. Below that on the next line and in the same column, is the word *"Masonry"* and below that on the next line in the same column are the words, *"All other work at the above location to be covered by this policy; it being agreed that wages expended for such work are to be adjusted in accordance with this Company's manual rates in effect at the time work is done."* On the same line with and following the word "carpentry" but in the column to the right headed "Estimated Wages and Other Remuneration for Policy period" appears the figures "$400," with "$2.50" placed thereafter in the next column to the right headed "Rate per $100 of Wages and Other Remuneration." On the line with and following the word "Masonry," but in the column headed "Estimated Wages," etc., and under the figures $400 above mention-

ed, appear the figures "$250" with "$3.50" given as
the "Rate per $100 of Wages." But after the words
"All other work at the above location to be covered by
this policy" there is no designation of the amount of
"estimated wages, etc., for the Policy Period" nor of
the "Rate per $100 of Wages," etc. The only thing pro-
viding for that is the statement, made in connection with
the "All other work," etc., to-wit, that it was "agreed
that wages expended for such work are to be adjusted in
accordance with this Company's manual rates in effect
at the time the work is done."

Below this, but still forming a part of "Item 4" is
the following:

"It is understood and agreed that the Policy is to
include all persons in the service of the assured engaged
in or connected with the operations herein described to
whom remuneration of any nature is paid or allowed, in-
cluding drivers, drivers' helpers, loaders, material hand-
lers, timekeepers, pay clerks, messengers, office force
and all others. There are to be no exclusions except
members of the firm, if the assured is a copartnership,
the President, Vice-president, Secretary and Treasurer,
if the assured is a corporation, and *those employees who
are noted specifically in Item 5.*"

The clause italicized above is in italics in the policy,
and "Item 5" to which italicized reference is thus made,
follows Item 4 immediately and is as follows:

"Item 5. Pursuant to the above declaration the
following employees are excluded from
the policy. *No Exceptions.*"

All of the language of Item 5 is printed except the
words, "No exceptions" which the company inserted
with a typewriter.

In Item 4, as above set forth, is the statement:

"Amount payable at the Beginning of Policy Period.
See Clause E. $37.50." Said clause E of the policy thus
referred to in Item 4, dealt with the premiums to be
paid, and provided that "it was based on the entire re-

muneration earned by all employees, except those specifically excluded, during the period of the policy, and if at the end of the policy period the entire remuneration exceeded the estimated remuneration set forth in the schedule, the assured should immediately pay the company the additional premium earned; if such remuneration was less than the sum set forth in the schedule, the company should return the unearned premium when ascertained; but the company should retain not less than the minimum premium stated in the schedule.

In Clause G. of the policy it was provided that the Company should be permitted to examine the books and records of the assured "at any time during the policy period, *and within one year after its final expiration,* so far as they relate to the remuneration earned by assured's employees while the policy was in force," and that "the rendering of any estimate or statement, or the making of any previous settlement, *shall not bar* the examination herein provided for, *nor the Company's right to additional premiums.*"

The evidence in plaintiff's behalf showed the following facts:

On June 20, 1916, Miss Miller, while on her way to her desk on the second floor of plaintiff's building and going through the shipping room in the basement of 1527 Genesee street, fell into the elevator pit, the construction of which was a part of the improvements which were the occasion of the taking out of the insurance and which was still in course of construction. Miss Miller was a part of plaintiff's clerical force. Her duties were of a general clerical nature; she received and entered orders in the order book, made out labels and carried them to the shipping clerks in the shipping room, and her duties required her to be frequently back and forth between her office up stairs and the shipping room in the basement where the improvements were in progress. As a part of her general duties, Miss Miller carried telephone messages to Cole and the other workmen engaged in the construction work in relation to

material and other matters in connection with said work. All of the clerical work incident to the auditing and payment of bills for labor and material in connection with this construction work was done in the general office on the second floor where Miss Miller and the other clerks had their desks and part of it was done by her. After she was hurt she was confined to her home and the hospital and never resumed her work.

The next day after Miss Miller's fall, plaintiff gave notice verbally over the telephone to McCluer, of Mc Cluer & Wilbur (who were defendant's general agents at Kansas City and who countersigned the policy), and also telephoned Peterson of Peterson Bros. who were defendant's soliciting agents and who delivered the policy and collected the premium. The next day plaintiff mailed a report of the accident to Peterson Bros. Insurance Agency. McCluer had instructed plaintiff in case of accident to call Dr. Carbaugh, defendant's surgeon; and pursuant to this instruction, plaintiff, immediately after the accident, called Dr. Carbaugh, who visited the young lady on the same day she fell and continued to treat her.

She had worked for plaintiff a long time, had no relatives in the city, and was in a serious condition. In reply to the telephone conversation McCluer had stated to plaintiff they would look after the claim and give it the best attention. There was some delay in the defendant's adjuster coming to investigate, and in the meantime defendant was paying the young lady her wages and also for a nurse. Consequently on July 24, 1916, plaintiff wrote to Peterson Bros. Insurance Agency calling their attention to the fact that he had reported an accident under the policy and asking that it be given immediate attention. On July 26, 1916, he mailed to Peterson Bros. a letter inclosing a duplicate report of the accident made out on one of defendant's blank forms. To this, Peterson Bros. Insurance Agency on July 27 replied saying they had "referred this to the adjuster and the same will receive prompt attention."

A day or so thereafter, Barry, defendant's adjuster, appeared at plaintiff's place of business, made an investigation into the accident, interviewed and took the statements of various employees of plaintiff, made sketches and diagrams of the room where the accident occurred, conferred and advised with the plaintiff, and with the latter's chief clerk.

In the meantime the young lady's condition was growing steadily worse and plaintiff sent his personal physician to see her in consultation with defendant's surgeon, Dr. Carbaugh. Plaintiff, therefore, complained to Barry, the adjuster, of the delay in looking after the case. Barry told him to keep on making payments to the girl and the Company would protect him under its policy. From time to time plaintiff called up both McCluer and Peterson about it and they assured him they were looking after the case and were protecting him. Matters ran along thus for more than three months. No suggestion or intimation was given plaintiff in any way that the Company was not liable under the policy, and defendant's adjuster Barry was in charge of the case and defendant's surgeon was visiting and in charge of the injured girl. On September 30, 1916, the adjuster, without making any explanation or giving any reason for so doing, or raising any question of its liability under the policy, wrote a letter to plaintiff inclosing a "non waiver stipulation." In the course of the letter it was stated that: "Before proceeding further in this matter, we require that these stipulations be signed," and plaintiff was requested to execute and return same to be sent to the home office.

The stipulation thus inclosed provided that "any action taken or heretofore taken by the said Insurance Company in investigating and (or) attempting to adjust and (or) adjusting and (or) defending any claim and (or) litigation growing out of an accident to Miss Louise Miller on the 21st day of June, 1916, on the premises known as 1525-27 Genesee street, Kansas City, Jackson county, Missouri, shall not be construed

as a waiver of the said Insurance Company's rights to deny liability under any policy or .policies issued to the said A. Reiger, and in effect at the time said acci- dent occurred, nor shall the execution of this agreement be construed a waiver of the assured's rights under said policy or policies."

As plaintiff understood the company was in charge, and as he had been assured by the adjuster and McCluer that the Company would protect him under the policy, and in view of the last clause of the above quotation from the stipulation, which provided that plaintiff was not waiving any of *his* rights, plaintiff signed the stipu- lation, and his son sent it to Barry. On October 7, 1916, Barry, by mail, returned one copy of the stipula- tion duly signed by the Company's general manager at the home office.

On October 27, 1916, Miss Miller brought her suit against plaintiff for $20,000 based on the grounds here- inbefore stated. Plaintiff immediately gave the in- surance company notice, and the latter, through its own attorneys, took charge of the defense and appeared and filed pleadings therein on behalf of Mr. Rieger, the defendant therein and the plaintiff herein. Said at- torneys had no authority or employment to do so except from the insurance company. On November 8, 1916, Miss Miller began, through her attorneys to take deposi- tions, and at the taking of these the insurance company's attorneys and also its adjuster, Barry, appeared and acted on behalf of Mr. Rieger and were in sole charge of the defense. On April 21, 1917, the insurance com- pany's attorneys, assisted by the adjuster Barry, took Miss Miller's deposition. As her suit was for $20,000 and the insurance company's liability was limited to only $5000, Mr. Rieger was interested in the suit out- side of and beyond the policy, and he, therefore, re- quested his own attorney to keep informed of the pro- gress of the case and render the insurance company's counsel all the assistance in his power. Plaintiff's said attorney was not an attorney of record in the case, did

not have charge of it, and was present at the taking of some of the deposition but not all of them. The most important one, that of Miss Miller herself, was taken by the insurance company's counsel acting in Mr. Rieger's name, and the latter's personal attorney was not present nor was he notified to attend or advised that it was to be taken.

Matters ran along thus until in May, 1917, when the Miller suit was set down for trial. During all of the time previous to this date, the insurance company, through its attorneys, had been in full charge of the investigation and defense and no intimation whatever had, thus far, been given to the plaintiff herein that the insurance company had any intention of denying its liability to protect and defend him against any adverse judgment to the extent of the policy limit of $5000.

By the terms of the policy the insurance company had the sole right to make settlement, on behalf of the assured, of any claim or suit.

Negotiations were had between Miss Miller's counsel and the insurance company, through its attorneys in charge of the suit, concerning a settlement. After the case had been set down for trial in May, 1917, the attorneys for the insurance company informed Mr. Rieger's personal attorney of these negotiations, and told him that in their opinion the Miller case was a dangerous one, likely to result in a heavy judgment against Mr. Rieger and that in their opinion the case could be settled within $5000 but suggested that Mr. Rieger should make the settlement, or pay therefor, *out of his own funds.*

Upon receiving this intimation, plaintiff herein, through his own attorneys, sought an explanation for this attitude and had an interview with the attorneys for the insurance company and the adjuster, Mr. Barry. What transpired at this interview can only be gleaned from the correspondence that ensued immediately after, beginning on the same date, May 9, 1917. It is manifest that at said interview, the attorneys for the insurance

company mentioned the approaching trial, said it was a dangerous case, that a heavy judgment against Mr. Rieger was probable, that it could be settled within $5000 and suggested that Mr. Rieger's attorney act with them *jointly* in affecting a settlement; that, thereupon plaintiff's counsel, in view of the facts, demanded that the insurance company's attitude be made plain, whereupon the company denied liability under the policy.

Immediately upon the return of plaintiff's counsel from this interview, they wrote a letter, dated May 9, 1917, reciting among many others the above-mentioned things that had transpired at the interview, and saying that in view of the insurance company's attitude denying liability, Mr. Rieger would not allow it to further defend the suit "except upon condition that by so doing your client (the insurance company) recognizes its obligation to protect and defend Mr. Rieger in accordance with the terms of the policies of liability insurance above mentioned." The letter then requested that, if it was not agreeable to the company to proceed with the defense on this condition, the plaintiff be notified at once, and that failure to so advise would be understood as an election to continue in charge of the defense and protect Mr. Rieger in accordance with the policy. The letter then proceeded: "Do not misunderstand Mr. Rieger's position. If your client is ready to recognize its duty and obligation under said policies to protect and indemnify Mr. Rieger against this suit, as in the policies set forth, and to pay any adverse judgment within the limits of the policies which may be rendered in this suit, then Mr. Rieger is entirely willing that your client should continue in charge of the defense, and will co-operate with your client in every way in his power; otherwise, he insists that your client retire from the case at once; thereby giving him an opportunity to protect his own interests in his own way, through his own attorneys."

A copy of said letter was also sent by registered mail to the home office of the defendant at Chicago.

Two days later, although the trial of the Miller suit was only five days off, the insurance company's attorneys answered the above letter, and said answer shows that the things mentioned above as having transpired at the interview did take place, but the letter said "we do not understand that Alexander Rieger is covered by the terms of the policies of insurance to which you refer; neither was prompt notice of the accident given, nor was an investigation made by the Insurance Company until long after the accident and after Mr. Rieger and the Rieger Investment Company had executed a stipulation that such investigation should be without prejudice. neither is it a fact that up to this time our client, through its investigators and attorneys, has had complete charge of the case. That is to say, we have always recognized that Mr. Rieger did not have adequate or certain protection and, therefore, we have at all times conferred and acted in conjunction with Mr. Rieger's attorney, Mr. Epstein, in every step taken in the case. No definite stand was taken in the matter however, for, in closing, the letter says: "As we told you during our interview of May 9th, we were not authorized to take any definite stand in this matter until after we had communicated with the Chicago office of the Insurance Company. We should hear from them to-morrow or Monday at the latest and will then advise you further."

On May 14, 1917, the day the case was regularly set for trial, the attorneys for the insurance company wrote plaintiff's attorneys saying they had received instructions from the company to withdraw from the case. Protest was at once made against this action; but after sending the letter of the 14th, the insurance company's attorneys, on the same day, sent a portion of the papers in the Miller suit, accompanied by a letter in which they said the carbon copies of the evidence taken by deposition were in Chicago; that they had wired for them and, when received, would turn them over also. They did so next day, May 15.

The court in the Miller case, owing to the condition presented by the aforesaid withdrawal of the attorneys, granted a postponement of the trial until May 23.

Plaintiff thereupon began preparation to defend the suit against him. Miss Miller was unable to walk, at least without crutches, and had lost the use of her left leg. She was in bed twitching nervously when seen, due to alleged injuries to her spine. Plaintiff investigated her previous physical history and found it to be good. He then had two physicians to examine her who reported her in a "serious condition" and that it was a "dangerous case." Plaintiff was advised by his attorneys after a full investigation, that so far as his liability was concerned there would probably be a heavy judgment against him. Confronted thus with this situation, the plaintiff on May 22, 1917, compromised the suit and paid the $4900 in settlement thereof as hereinbefore stated. Evidence was offered showing that he did so in good faith and in the reasonable fear that a judgment for damages in a much larger sum would result. He also offered evidence as to the expenses incurred in connection with the suit.

Defendant's contention is that the policy did not cover the accident to Miss Miller or any clerical employee of plaintiff and that the terms of the policy excluded any other construction, under the rule of *ejusdem generis*. That rule is well settled, and we have no disposition to question it in any case to which it is properly applicable, and, no doubt, it is applicable even to contracts of insurance, under proper circumstances. By applying the rule of *ejusdem generis*, defendant says the phrase "all other work" must be interpreted to refer solely to the kind of work theretofore mentioned, and that, therefore, it meant only those employees engaged in the carpentry, masonry and work similar thereto in making the improvements to the building. If this portion of the policy were all there was concerning its scope and what it was to cover, there might be force in the contention. But it is only a very small portion

thereof; and in construing the policy to determine what is covered thereby, we do not think it permissible to take merely this one small segment, and, by the rule of *ejusdem generis,* confine the scope of the policy to the character of work specifically named. By section 1 of the policy the company agreed to insure plaintiff against loss from liability for damages on account of bodily injuries *"suffered by any employee or employees* of the assured while at the places herein named, as the result of accidents occurring within the period herein stated *through the prosecution of the business operations herein described."*

In said "Item 4," the same item wherein the company wrote the statement: "All other work at the above locations to be covered by this policy," appears the further statement that, "It is understood and agreed that the policy is to include *all persons in the service of the assured engaged in or connected with the operations herein described* to whom remuneration of any nature is paid or allowed . . . including *messengers, office force* and all others. *There are to be no exclusions except* members of the firm, if the assured is a copartnership . . . *and those employees* who are *noted specifically* in Item 5." Said Item 5, following immediately thereafter read: "Pursuant to the above declaration, the following employees are excluded from the policy ———. And in this blank, left for the purpose of inserting the exceptions, the company wrote the words, *"no exceptions."*

The policy is the company's own contract. It prepared it and chose the words to express the meaning thereof. If it had desired to restrict the operations insured against solely to construction work, should it not have said so clearly in the policy? The company knew the assured had many employees engaged in work in and around the very place where the construction work was to be done. These employees, engaged in plaintiff's mercantile business, where the improvements were being made, were open to almost as many dangers

therefrom as were those specifically engaged thereon with hammer, saw or trowel. And the insurance company could reasonably know that it was the recognition of the danger to the employees in general, arising out of the improvements to be made, that induced plaintiff to take out such insurance. To read the policy as a whole, or even to simply read all of those portions thereof which were inserted by the company to set forth the details of the particular insurance which the policy as a whole was to effect, it would certainly *appear* to cover all of the assured's employees, and would reasonably lead assured to think that it did. Under these circumstances, we do not think it permissible to defeat the insurance by extracting from the policy merely one small segment thereof and applying to that one portion the rule of *ejusdem generis*.

Moreover, it will be observed the policy does not state that, in order for an employee to be covered, he must be injured *while* engaged in or connected with the business operations described in the policy, but it is sufficient if such employee be injured *through* the prosecution of said business operations. One of the meanings of the word, "through," and the one applicable to the word as here used, is "on account or by reason of." [New Standard Dictionary.] It would seem that Miss Miller's *injury* came within that description. And, on the question whether she was such an "employee" of the assured as brought her within the scope of the policy, the contract says it protects against liability for injuries to "*any* employee." In another place it says, "all persons in the service of the assured engaged in or in connection with the operations herein described including *messengers, clerical force* and all others." And in another place, left for the exclusion of employees from the coverage of the policy, it says there are "no exceptions." It is true, the phrase "all persons in the service of the assured" is qualified by the words "engaged in or connected with the operations herein described" but this qualification, appearing only in this one

place, is itself enlarged by the words "including . . .
*messengers, clerical force* and all others." It is in
evidence that not only was Miss Miller engaged in and
connected with plaintiff's business operations carried
on in the building, but she, as *clerk and messenger*,
actually participated in the improvement work. She
did not have to actually use a hammer and saw or drive
a nail in order to be connected therewith, but she could
and did materially assist in and expedite the building
operations by acting as messenger, conveying messages
telephoned to the workmen relative to the matters neces-
sary in the course of the work. She, therefore, came
within the meaning of the term "employee" even as
restricted in this one place and even if the term there
used, namely, the "operations herein described" (which
in all other places was termed *"business* operations")
be regarded as applying strictly to the construction
work in the improvements and not to all the business
operations going on in the building.

However, if we should be wrong in this view, still
the policy cannot be said to be so plain and unambiguous
as to leave no doubt but that employees of Miss Miller's
class were not included. If it does not specifically and
plainly include employees of her character and class,
then the most that can be said is that the policy is at
least ambiguous, susceptible of two different mean-
ings. (And it would seem, in view of the conduct of
defendant in first taking hold of and retaining the case
without questioning or denying its liability, that the
construction defendant now places upon the policy is
not readily apparent, else it would have discovered and
stood upon it at once). If the policy be ambiguous,
then under settled rules relative to the construction of
insurance contracts, that construction must be adopted
which is most favorable to the insured. In other words,
if the policy be reasonably susceptible to two different
meanings, then it should be so construed as to give effect
to the contract rather than to defeat it. [Fairbanks
Canning Co. v. London Guarantee & Accident Co., 154

Rieger v. London Guar. & Acc. Co.

Mo. App. 321, 334.]  And this principle applies to policies of employer's liability insurance in determining who and what they cover.  [London Guarantee & Accident Co. v. Ogelsby, 231 Pa. 186; Dives v. Fidelity & Casualty Co., 206 Pa. 199; Cashman v. London Guarantee & Accident Co., 187 Mass. 188; Fuller Bros., etc., Box Co. v. Fidelity & Casualty Co. v. Phoenix Mfg. Co. 100 Fed. 604; Hoven v. West Superior Iron Co., 93 Wis. 201; Fidelity & Casualty Co. v. Lone Oak Cotton Oil & Gin Co., 80 S. W. 541.]

But Clause D of the policy provided that "it did not cover loss from liability for injuries suffered by "any person unless his remuneration is included in the amount upon which the premium is based."  And defendant says that as the remuneration paid Miss Miller was not included in the amount on which was based the premium paid by plaintiff, therefore, the policy did not cover her.  Non-payment of premium is an affirmative defense and must be specially pleaded.  If such policy provision was pleaded it is to be found only in the words "as required by the provisions of the policy which was issued, as stated in defendant's answer herein" contained in the amendment made to the answer after plaintiff's case was closed.  Passing the question of the sufficiency of this method of pleading the policy provision on which the defense raised in the amendment is based, we go direct to the merits of the defense.

As heretofore disclosed in the statement of the case, the wages for the carpentry work were estimated to be $400 for the policy period of six months and the rate of premium for that was $2.50 per hundred, the wages for masonry were estimated to be $250 at $3.50 per hundred.  But, as heretofore stated, the wages paid for "all other work at the above locations" which was "to be covered by this policy" were not stated nor was the rate fixed.  The policy provided for a "minimum premium" which in this case was $37.50.  And, in connection with the "other work" the company wrote in the provision that it was "agreed that wages for such

work are to be adjusted in accordance with this company's manual rates in effect at the time the work is done.'' This left the premium to be paid for that work, whatever it was, to be subsequently determined. And clauses E. and G. of the policy, heretofore quoted, made provision for an audit of assured's books by the company in order to ascertain the balance of premium due; and the last named clause permitted the Company to *examine* assured's books and records *at any time* during the policy period *and within one year after its final expiration,* and the rendering of any former statement or the making of any previous settlement, should not bar the Company's right to examine the books or to demand the additional premiums.

The evidence is that, some time *after the accident to Miss Miller,* and after the expiration of the first specified period of the policy, the Company's payroll auditor came to plaintiff's place of business to audit his books in order to ascertain the amount of premium that, in addition to the ''minimum premium,'' was due; that plaintiff told his son to give the auditor free access to all books and to afford him whatever information he called for. This the son did. Neither plaintiff nor his son were asked to or did assist either at the investigation for or in the preparation of the auditor's report, but the same was done by the auditor himself going through the books and making up a report which the auditor presented to the son to sign, and he, supposing everything was all right in view of what his father had told him, signed it and paid the premium based on such audit. The auditor did not include in this report wages paid for any kind of work except carpenters, masonry and plumbing. As the wages of the clerical force were not included, nor the wages of the other business employees, Miss Miller's remuneration was not a part of the amount shown in this report, hence it was not in the amount on the basis of which the premium was calculated. The policy, by its original face terms, expired August 23, 1916, but was renewed for a further period

of six months ending February 23, 1917, which was the time of its *"final* expiration" and under the provision in Clause G. the Company had a year from that time, or until February 23, 1918, within which to make such additional audit and to charge and collect such additional premium as might be due. The audit by the Company was made in March, 1917, sometime *after* the accident to Miss Miller. It was clearly known then that she, as a member of the office force, had been hurt and the manner thereof and that the Company was being held liable therefor. This suit on the policy was filed June 6, 1917; defendant filed its answer September 26, 1917, and certainly when it did this, it knew all it knows now and could have demanded additional premiums had it desired. But not until after the time for demand, thereof had expired and not until the close of plaintiff's case was non-payment of premiums raised. The point of non-payment of premium cannot be relied upon, as it was waived.

It is urged by defendant that plaintiff's conduct shows that he interpreted the contract as not covering Miss Miller or the accident and that it was "not intended by the parties to be covered." The failure to include Miss Miller's remuneration in the basis of the premium to be paid cannot be said to conclusively show such interpretation on plaintiff's part, since, as shown, that was the Company's failure and not the insured's. And since that failure occurred *after* the accident, such failure can as well be referred to the Company's desire *not* to have her wages included. With reference to the taking out of the policies with the defendant for periods only of six months, it may be observed that this is not even of moment much less conclusive, since the danger to employees in the building *arising from the construction of the improvements,* which was the danger insured against in defendant's policies, would not last longer than the period deemed necessary to make such improvements. The fact that insured, at the time he took out the insurance herein, also had an employer's liability

policy in the Ocean Accident & Guarantee Corporation covering his business employees, does not conclusively establish defendant's contention. That policy insured plaintiff only against loss from liability for injuries to employees "while engaged in the trade, business or work described in said Declarations." And in paragraph 5 of the "Declarations," thus referred to, the description of the trade business or work covered by the policy and classifications of risk was put down as "all operations and processes *necessary and commonly incidental* to the trade, business or work herein described as follows: All work *usual and necessary* to wholesale and retail liquor dealers," etc. It is true, in paragraphs C. and D. of the Ocean policy additions and alterations to the building and the installation of additional mechanical equipment were included but these were declared to be applicable to "manufacturing risks only" while, in another clause, it was provided that the policy should not cover injuries caused by or through the existence, maintenance or use of an elevator, elevator shaft or hoistway, etc. So that it is not unreasonable to infer that on account of the inapplicability of this policy to the dangers incident to the improvements to be made, the plaintiff sought a short term policy which he thought would cover his employees as to such dangers. For this reason also no conclusive inference as to what plaintiff intended to be covered can be drawn from the fact that nothing was said in the policy sued on about other liability insurance, that being left blank. Nor is the question here considered affected by the fact that when the accident happened the plaintiff, at the time of notifying the defendant, also, out of the abundance of caution, notified the Ocean Company. That Company, unlike the defendant, immediately denied liability and no claim was ever asserted by plaintiff against it.

In connection with what is here said concerning defendant's contention that the acts of plaintiff show that he interpreted the contract as not covering employees of Miss Miller's class, and that such "was not intended

by the parties (to the contract) to be covered," it may be well to say that defendant at the trial, in cross-examination of plaintiff, went into this subject and endeavored to show that plaintiff did not consider that Miss Miller was covered by the policy when he took it out. Plaintiff had attempted to show the conversation had with Peterson the soliciting agent relative to what plaintiff desired the policy to cover, but, on objection, this was excluded. After the above cross-examination, and in view thereof, plaintiff offered to show the negotiations had with McCluer in company with Peterson at plaintiff's place of business, that they interrogated him fully as to the nature of the business and what he wanted the policy to cover, that he told them what he was going to do and wanted the insurance to cover all his employees whether actually engaged in construction work or in plaintiff's business carried on in the building, and that McCluer told plaintiff the policy he would issue would grant the coverage plaintiff desired; also, that at the time the policy was taken out the same information and assurances were given by McCluer and Peterson together in one and the same conversation, and that they both told him they would cover him against everything and that all his employees would be covered; that thereupon he agreed to take the policy and it was prepared entirely by the Company through its agents McCluer & Wilbur and assured accepted it thinking the policy conformed to that understanding. The offer was rejected. We think that the evidence was competent under the circumstances. [Fuller Bros., etc., Box Co. v. Fidelity & Casualty Co., 94 Mo. App. 490, 494-7.]

Returning, however, to the question concerning the propriety of the demurrer, it would seem that, aside from what has been said, the demurrer should not have been sustained because of the showing made with reference to the estoppel pleaded. The facts relied upon to constitute such plea have already been fully set forth, and it is unnecessary to repeat them here. Certainly,

14—Mo. App.

if true, they constitute sufficient ground for estoppel. [Fairbanks Canning Co. v. London Guarantee & Accident Co., 154 Mo. App. 327; Compton Laundry Co. v. General Accident Assurance Co., 195 Mo. App. 313, 332; Royle Mining Co. v. Fidelity & Casualty Co., 126 Mo. App. 104; Royle Mining Co. v. Fidelity & Casualty Co. 161 Mo. App. 185; Mytton v. Fidelity & Casualty Co., 117 Mo. App. 442.]

But it is contended that the stipulation plaintiff signed prevented or defeats all estoppel. We do not entertain that view. At the time it was signed, the plaintiff had theretofore been assured that the Company would take care of the case and the Company had taken hold thereof, thereby evincing a recognition of its duty to do so. Not the slightest intimation had been given plaintiff that there was any question of the defendant's liability under the policy. Nor was any such intimation or explanation given at the time the stipulation was sent to plaintiff, nor even after it was obtained until long afterward as hereinbefore stated. There was no controversy or dispute existing between plaintiff and defendant at the time the stipulation was signed. Whatever rights he possessed had already accrued. There was, therefore, no consideration for the stipulation, the principle being the same as in a contract of compromise or release. [Goodson v. National Masonic Aid Assn., 91 Mo. App. 339.] See, also, the application of this principle in the case of Royle Mining Co. v. Fidelity & Casualty Co., 161 Mo. App. 285, 200. Another thing, the stipulation expressly provided that plaintiff in signing it waived none of his rights. These, including the right to claim estoppel, had already accrued as heretofore stated, and consequently the stipulation amounted to nothing. Besides, the whole conduct of defendant was inconsistent with the idea of a waiver. It is not permissible for a party to avoid the effect of that which it has done and is still doing, by asserting that such is not being done. [Erwin v. Springfield Fire & Marine Ins. Co., 24 Mo. App. 145, 153; Phillips v. Protective Ins. Co., 14 Mo. 220, 236.]

Nor did plaintiff force defendant from the further defense of the Miller suit and thereby disable the plaintiff to claim against it the payments made in settlement of the Miller suit. The answer pleaded that such payments were voluntary. The facts show that they clearly were not. Besides, the Company had breached its contract, and under these circumstances, the insured had the right to, in good faith, make the best compromise he could and is not bound to submit to an adverse judgment. [St. Louis Dressed Beef, etc., Co. v. Maryland Casualty Co., 201 U. S. 173; Compton Laundry Co. v. General Accident Ins. Co., 195 Mo. App. 313, 322; Murch Bros. Co. v. Fidelity & Casualty Co., 190 Mo. App. 490; Kansas City, etc., R. Co. v. Southern Ry. News Co., 151 Mo. 373, 390.] In addition to this, the evidence does not show that defendant was forced out of the defense. It had been allowed to take charge, and had continued therein, under the idea that it was doing so in recognition of its liability under the policy. It was only for that reason the plaintiff surrendered his right to control his defense in his own way and through his attorneys. This is an important right; one that plaintiff could not be expected to surrender to the insurance company if there was no liability upon it involved in the outcome of the suit defended, in order to spur them on to do their best. The plaintiff had the right to insist that, if the Company was not going to recognize its liability under the policy, it had no right to control his defense, which right they could claim only by virtue of that policy.

Being of the opinion that the defendant was not entitled to have its demurrer to plaintiff's evidence sustained, the judgment is reversed and the cause remanded. All concur.