Richard D. JACKSON

v.

ROYAL INDEMNITY COMPANY.

Civ. A. No. 58-312.

United States District Court
D. Massachusetts.
April 2, 1959.

Edward E. Cohen, Boston, Mass., for plaintiff.

Ralph H. Willard, Jr., Boston, Mass., for defendant.

ALDRICH, District Judge.

This is a diversity action by an owner of a private airplane on an insurance policy for loss incurred as a result of his plane running beyond the landing strip and upsetting. On the afternoon of June 8, 1957 the plaintiff was piloting three passengers and himself in a four-passenger private plane known as a Piper Tri-Pacer. He first landed in Provincetown, Massachusetts, at which time he discovered his brakes to be inoperable, due to a leak. The leak could not then be fixed, but enough fluid was added to effect what was believed to be an adequate temporary repair. The party then set off for the airport at Chatham, Massachusetts. At Chatham there is a single strip, about 2500 feet long, which runs 60°–240° (about NE x E and SW x W). The plaintiff circled the field and sought to talk with the ground, but the intercom did not function. There was not enough wind to operate the wind sock. He elected to come in from the south. The wind was blowing about 10 m. p. h. from somewhere between SE and SSE, or almost directly across the strip. Except for the point of touching down on the airstrip, hereinafter discussed, plaintiff made a normal landing, at about 50 m. p. h. Applying his brakes and getting no response,—apparently because the fluid had leaked out again—he cut the ignition switch, but continued on the entire remaining length of the landing strip, across a 100 foot turf safety strip at the far end, and into 50 feet of rough ground, where he bent the support of his front landing wheel and flipped over. The plane suffered damage in the amount of $3,150.

Apart from the above there is a considerable conflict in the testimony. The plaintiff was an unsatisfactory witness, having testified that he came in headed south, headed north, headed downwind, and upwind, and headed NW, and NE, along with other discrepancies. These may all well be explainable, but they do not give me great confidence as to the accuracy of his observations. The male passenger, again perhaps understandably, is subject to somewhat the same comment. Both men testified that the plane touched ground near the beginning, or within the first quarter, of the landing strip. The plaintiff claimed that the plane slowed down to 15–18 m. p. h. after proceeding 100 feet, and thereafter gradually slowed down to 8 or 9 m. p. h. In view of the length of the strip, this would have resulted in a run-out of about a minute. The male passenger said they were going 40 m. p. h. by the speedometer about two seconds before the accident, and that the whole interval from when the plaintiff ineffectually pulled the brake handle to the flip-over, was about three seconds. Even making large allowances, and not holding this witness to mathematical accuracy, but treating this testimony simply "as painting a general picture of the event," Russell v. Gonyer, 1 Cir., 264 F.2d 761, its general concept of immediacy is still entirely inconsistent with the picture painted by the plaintiff, and clearly suggests that the plane either landed considerably nearer the far end of the strip,

or never slowed down to the extent that the plaintiff says. This would be in accord with defendant's witnesses.

On all the evidence I find that the plaintiff came in somewhat high, and landed further down the strip than he now remembers; that from the middle of the strip to the far end the ground slopes slightly downward; that because of this fact, and the absence of any braking effect of a head wind, and, of course, the complete failure of his own brakes, his landing speed was never reduced to normal taxiing speed prior to the breaking of his front landing gear in the rough.

The material policy provisions are as follows:

| Coverages | Amount of Insurance | Deductibles | | Premium |
| | | Ground Except Taxiing | In Flight and Taxiing | |
|---|---|---|---|---|
| A All Risks Ground and Flight | $ | | | $ |
| B All Risks Except While in Flight | $5,000 | $50. | $250. | $100. |
| C All Risks Except While in Flight and Taxiing | $ | | | $ |

Under Definitions appeared the following:

" 'Flight'—the period from the time the aircraft moves forward in taking off or in attempting to take off for air transit, while in the air and until the aircraft completes its landing run, or has attained normal taxiing speed, after contact with the land or water.

" 'Taxiing'—while the aircraft is moving under its own power or momentum generated thereby on land or water other than while in motion for the purpose of taking off or landing."

The plaintiff's coverage is only under "B," which I construe to include taxiing, but to exclude flight. By definition flight includes that part of the ground operation which is embraced within the normal meaning of taking off and landing, but does not include maneuvering prior thereto, or subsequent thereto. While the difference between a landing run and taxiing is clear enough in theory, a determination of when this change-over takes place in cases where the pilot seeks to continue to the parking space without stopping may well lead to disputes. Hence the policy provides that flight may be regarded as having terminated when the landing speed has been reduced to normal taxiing speed. My finding that this reduction did not take place disposes of plaintiff's case. More fundamentally, however, I rule that the plaintiff could not recover here even had his speed dropped to normal taxiing speed at or prior to the actual instant of the impact which caused the flip-over. It is undisputed that the plaintiff landed with a defective brake, found himself out of control, shut off his motor, and was carried forward in a direction and to an extent he did not choose solely by virtue of the forces to which he was subject on landing. This was a flight or landing loss. The damage cycle, commencing with the defective brake, had already been put in motion by the flight or landing, and the eventual crack-up while still out of control was but the inevitable end result, which would not lose its character merely by reason of slackened speed at the instant of final catastrophe. In this respect the case is just the opposite of Great American Ins. Co. v. Bass, 208 Miss. 436, 44 So.2d 532, but the

244

language of the court is quite appropriate. See also James v. Federal Ins. Co., 5 N.J. 21, 73 A.2d 720.

The plaintiff claims that the defendant is relying on a technicality. Instead, I find he bought something less than the full available coverage, which, unfortunately for him, proved to have been a poor choice. The complaint is dismissed.