424 F.Supp. 570 (1976)
COTTON BELT INSURANCE CO., INC., a corporation, Plaintiff,
v.
Linda HAUCK and Harlond H. Hauck, d/b/a Hauck Investment Corporation, Defendants.
No. 74-510C (A).
United States District Court, E. D. Missouri, E. D.
May 3, 1976.
*571 Lucas & Murphy, St. Louis, Mo., for plaintiff.
Veryl L. Riddle, John R. Truman, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
HARPER, Senior District Judge.
Plaintiff, as assignee of Commercial Credit Equipment Corporation (hereinafter referred to as CCEC), brings this action against Linda Hauck and Harlond H. Hauck, d/b/a Hauck Investment Corporation (hereinafter referred to as Hauck), seeking the unpaid balance which plaintiff alleges is due on a promissory note secured by a chattel mortgage that Hauck had executed to K. C. Piper Sales, Inc. (hereinafter referred to as Piper) to purchase a Cessna 414 airplane, and which had been assigned by Piper to CCEC. The defendants have filed a counterclaim against the plaintiff in which they allege that the amount of $126,000.00 is due and payable by plaintiff to the defendants under the terms of an insurance policy. Plaintiff had issued an insurance policy, designating CCEC as the Loss Payee, which extended coverage for any physical damage resulting to Hauck's airplane. The airplane was totally destroyed in a collision on October 26, 1973, during the effective period of the policy. Jurisdiction of this Court is based upon diversity of citizenship and amount pursuant to 28 U.S.C. § 1332.
In accordance with the Court's pre-trial order, the parties filed proposed findings of *572 fact, a greater part of which are not disputed. This case was tried by the Court without a jury. The common proposed findings of fact, credible testimony, exhibits and pleadings reveal that on or about June 22, 1973, the defendants, as individuals, jointly and severally, executed and delivered within the State of Missouri, a certain aircraft chattel mortgage (Plff's Ex. 2) covering a Cessna 414 airplane. The chattel mortgage was to secure defendants' indebtedness to Piper from whom they had purchased the aircraft, and represented the balance of the purchase price plus interest not paid by defendants at the time of delivery of the aircraft. Piper immediately assigned the note secured by chattel mortgage to CCEC.
The total cash delivery price of the aircraft was $168,000.00, of which the defendants had paid $18,000.00 cash as a down payment. The defendants, as mortgagors, agreed to pay to CCEC eighty-four (84) monthly installments in the amount of $2,556.26 each, which would equal monthly time balance on the unpaid cash sales price of $150,000.00, plus interest. Payments were to be made on the 25th of each month beginning in July of 1973. The chattel mortgage in question (Plff's Ex. 2) states in part:
"Mortgagor covenants, warrants and agrees that: * * * (j) it will, at its own expense, so long as any indebtedness is owning hereunder, keep in force such insurance on the aircraft and such other insurance as Mortgagee may require, written by a company or companies, and insuring against such hazards, and in such amounts and form as are acceptable to Mortgagee, and such policy or policies, with premium receipts therefor, shall be delivered to Mortgagee, and the policy or policies shall by endorsement acceptable to Mortgagee provide that losses thereunder shall be first payable to Mortgagee, as its interest may appear, and Mortgagor hereby assigns to Mortgagee the proceeds of all such insurance (including any refund of premium) to the extent of the indebtedness secured hereby, directs the insurer to make payment of any losses or refunds directly to Mortgagee, and appoints Mortgagee as Attorney-in-Fact to endorse any draft, check or other form of payment made by the insurer."
Pursuant to the terms of the chattel mortgage and at CCEC's request, Hauck procured an insurance policy from plaintiff, Cotton Belt Insurance Company (hereinafter referred to as Cotton Belt). Sections F and G of Part III of that policy, respectively, provided coverage for all physical damage to the airplane for both "All Risks in Motion" and "All Risks Not In Motion" from June 15, 1973, to June 15, 1974. The Policy Provisions to Sections F and G of Part III state:
"Coverage FAll Risks in Motion
Coverage GAll Risks Not in Motion
To insure, subject to the applicable limit of liability and deductible against:
F. all risks of physical loss or damage to the aircraft;
G. all risks of physical loss or damage to the aircraft sustained while the aircraft is not in motion under its own power or the resulting momentum thereof;
hereinafter called `loss'".
However, coverage for "All Risks In Motion" in Section F is limited by Item 6 of the policy where it states: "PILOTS: The coverage afforded by this policy shall not apply while the aircraft is operated in flight by other than the following pilots * * *."[1]
*573 In addition, the insurance policy contains a "Breach of Warranty Endorsement" which provides at paragraph 4:
"4. Whenever the Company shall pay the Lienholder any sum for loss or damage under this Policy and shall claim that, as to the insured or owner, no liability therefor existed, the Company shall, to the extent of such payment, be thereupon legally subrogated to all the rights of the Lienholder against the Insured or owner and in and to all the property held as security for indebtedness: or the Company may, at its option, pay the said Lienholder the whole amount due or to become due from the insured or owner, with interest, and shall thereupon be entitled to receive a full assignment and transfer of all the rights of the said Lienholder against the Insured or owner of all property held as security for the indebtedness."
In compliance with section (j) of the chattel mortgage noted earlier, the insurance policy designated CCEC as payee in the "Loss Payable" clause of Item 7. Also, by the terms of the chattel mortgage, Hauck was charged with the responsibility of making all premium payments on the policy.
On September 24, 1973, Hauck contacted his insurance agent, M. T. Galbraith, for the purpose of adding another pilot, Ronald J. Showalter, to those pilots already designated in Item 6 of the existing policy. In response to questions by Galbraith with respect to Showalter's qualifications, Hauck called Showalter and asked him for the appropriate information. Relaying Showalter's answers, Hauck told Galbraith that Showalter possessed 2,500 hours of total logged flight time and 150 hours of multi-engine flight time. Hauck did not, however, verify this information by checking Showalter's pilot log books. Had he done so, Hauck would have discovered that Showalter actually had less than 2,316 hours of total time logged and less than 102.9 hours of multi-engine flight time. Irregardless of Showalter's misrepresentations, Hauck told Galbraith what he, himself, believed were Showalter's true qualifications. Based upon these representations and an agreement that Showalter would receive an additional ten hours of dual flying, Cotton Belt subsequently issued a temporary endorsement to the existing policy by letter (Plff's Ex. 9) which, by its terms, extended "in flight" coverage for physical damage to Hauck's airplane when Showalter was flying it.
At about 7:15 p. m. on October 26, 1973, after dark, Showalter as the sole pilot, landed Hauck's airplane on the 2600 foot-long black, asphalt runway at the Rolla Downtown Airport. Touching down about one-third of the way from the east end of the runway, Showalter was unable to stop the aircraft from continuing off of the west end of the paved runway. In landing west, Showalter planned his trajectory high enough to clear the trees, telephone poles and power lines which reach about 15 feet above ground level from the drop-off at the east end of the paved runway, and as a result could not stop the plane on the paved runway.
At the west end of the asphalt-paved runway there extends a "grass runway" for about 1,000 feet and a cleared area for about another 1,000 feet beyond the grass runway. The plane landed heading west and rolled of its own momentum onto the grass runway approximately 200 feet west of the edge of the paved runway. At this point, Showalter started to taxi to the ramp. He made a 90-degree turn to the right, thereby moving the plane slightly north of the center line of the grass runway, when the right side of the plane settled down and the plane stopped completely and came to rest.
Showalter shut down the airplane's power and lights and stepped out of the plane. He then observed that the right tire was flat. Unable to taxi further, Showalter left the plane to get assistance to move it. When Showalter left Hauck's plane it was completely shut down, pilotless, motionless and undamaged except for one flat tire.
Within ten minutes after Showalter landed and while he was gone for help, an aircraft piloted by one Hugo Schell came in *574 for a landing heading east. The sides of the paved runway were outlined with lights but their intensity was too low to illuminate the runway. As Schell came in for a landing, his aircraft was in line with the runway, but he did not see Hauck's aircraft. The evidence shows that Schell's landing light was burned out. When Hauck's plane came into view, Schell was already committed to land, and he was unable to avoid colliding into it.
By a letter to Hauck dated January 4, 1974, Cotton Belt denied liability and coverage because "[A]t the time of the loss, the aircraft was being operated in flight by a pilot who did not possess the specifications and requirements as stated in Item # 6 of the insurance policy covering said aircraft" (Defts' Ex. A).
The "Part III  Physical Damage" section of Hauck's policy states: "With respect to a total loss the company will pay the actual cash value of the aircraft at the time of the loss * * *." The actual cash value of Hauck's aircraft at the time of the loss was at least $150,000.00, less $24,000.00 in salvage payments, or $126,000.00. Although Cotton Belt had denied liability as to Hauck, it made a payment of $126,000.00 to CCEC on March 20, 1974, pursuant to the terms of the "Breach of Warranty Endorsement" in the insurance policy. On May 21, 1974, CCEC assigned Hauck's note to Cotton Belt in exchange for that $126,000.00 payment in accordance with paragraph four of the "Breach of Warranty Endorsement".
Hauck had made four payments on the note to CCEC prior to the accident which totalled $10,225.04 and one payment of $2,732.13 after the accident. Since the amount due on the note is reduced by unearned interest, the amounts received by CCEC ($126,000.00 from Cotton Belt and $24,000.00 from salvage) equal the full amount due on Hauck's note.[2]
At the outset, plaintiff contends that Hauck's misrepresentations to Galbraith with respect to Showalter's experience and qualifications were material and thereby rendered the policy voidable or void. However, the Court notes that plaintiff did not rely upon such a claim in earlier pleadings, including its answer to defendants' counterclaim, but rather asserted it for the first time in a post-trial brief. Furthermore, plaintiff did not mention this defense at all in its declination of coverage letter (Defts' Ex. A) to the defendants. Under Missouri law, which governs here, when a bonding company or insurance company denies liability on one basis, it waives all defenses to the insured's claim which are not asserted in its declination of payment. Delmar Bank of University City v. Fidelity & Deposit Company of Maryland, 428 F.2d 32 (8th Cir. 1970); Aetna Casualty & Surety Co. v. Haas, 422 S.W.2d 316 (Mo.1968); State Farm Mutual Automobile Ins. Co. v. Central Surety & Ins. Corp., 405 S.W.2d 530 (Mo.Appl.1966). The Court, therefore, concludes that Hauck's insurance policy was in force at the time of the collision.
Turning to the merits of the case, plaintiff claims that it declined coverage under the policy as to Hauck because the aircraft was destroyed while it was being operated "in flight" by Showalter, a pilot who did not possess the qualifications required by the insurance policy. Therefore, plaintiff contends that it did not pay CCEC the $126,000.00 pursuant to the provisions of the insurance policy itself, but rather, pursuant to its endorsement to CCEC for "Breach of Warranty." As assignee of the unpaid note, plaintiff claims that it is now entitled to judgment thereon. The defendants, however, contend that Cotton Belt's payment to CCEC served to extinguish the debt due on Hauck's promissory note in the first place.
In United Stores of America, Inc. v. Fireman's Fund Ins. Co., 290 F.Supp. 61 (E.D. Mo.1968), aff'd 420 F.2d 337 (8th Cir. 1970), there was a situation analogous to that in the case at bar. The lessee of a building was required by the terms of his lease to *575 procure and pay for insurance on the premises. Pursuant to those terms, the lessee had procured fire insurance policies which designated the mortgagee of the building as the loss payee. After the insured building was destroyed in a fire, an insurer claimed that either the mortgagor or the lessee had caused the fire and thus breached the insurance policy. Therefore, the insurer denied coverage as to them, but nevertheless paid the insurance proceeds to the mortgagee as loss payee pursuant to the "standard mortgage clause" in the policy and, in return, obtained a pro tanto assignment of the note from the mortgagee. In its opinion, the District Court relied upon various authorities for the proposition that it is insufficient for the insurer to simply "claim" nonliability as to the mortgagor. Rather, "[the insurer] must show a state of facts which would entitle it to exemption from liability to the mortgagor." 290 F.Supp. at 65.
Finding that neither the mortgagor nor the lessee had caused the fire, the Court determined that the pro tanto assignment obtained by the insurer from the mortgagee was unenforceable and invalid because neither the mortgagor nor lessee had breached the insurance policy in the first place.
The Eighth Circuit stated that the issue was whether the insurance policies were procured for the benefit of the lessor-mortgagor. In finding that they were, the Court of Appeals affirmed the District Court's decision and held:
"Where as here, the policyholder does not acquire the fire insurance for the sole benefit of the mortgagee and the mortgagee neither procures the issuance of the insurance nor pays the premiums, acceptance of those insurance proceeds by the mortgagee after a loss carries with it the concomitant obligation to apply them for the purpose or purposes for which the policyholder obtained the coverage. In this case, those purposes are satisfied by application of the proceeds to reduce the mortgage indebtedness. This application extinguishes the mortgage indebtedness to the extent of the payment to the mortgagee and nothing further remains of that part of the indebtedness which can be assigned to the insurer pursuant to its subrogation clause." 420 F.2d at 340.
Since Hauck, like the lessee in United Stores of America, had procured and paid for both an insurance policy and "Breach of Warranty Endorsement" for the benefit of the mortgagor, Cotton Belt must demonstrate to this Court that its reason for denying coverage as to Hauck is based upon a proper state of facts.
Plaintiff derives its position from the language in Item 6 which limits "All Risks in Motion" as follows: "[C]overage afforded by this policy shall not apply while the aircraft is operated in flight by other than the following pilots." Therefore, plaintiff presumes that Hauck's airplane was "in flight" at the time of the collision.
"Flight", the key word in plaintiff's position, is defined in the insurance policy as:
"* * * [T]he time commencing with the actual takeoff run of the aircraft and continuing thereafter until it has completed its landing run." (Emphasis added.)
Since Showalter was returning from and not beginning a flight, the issue here is whether or not Showalter had completed his landing run when the collision occurred. However, the term "landing run" is not defined in the insurance policy. In the absence of a policy definition, any doubt or ambiguity resulting over the meaning of a policy provision must be resolved in favor of the insured and against the insurer. Harry Winston, Inc. v. Travelers Indemnity Co., 366 F.Supp. 988 (E.D.Mo.1973), aff'd mem., 492 F.2d 1248 (8th Cir. 1974); McMichael v. American Ins. Co., 351 F.2d 665 (8th Cir. 1965).
Citing the following authorities,[3] plaintiff contends that Hauck's airplane was "in flight" at the time of the collision because Showalter had not completed his landing run. Bryant v. Continental Ins. Co., 2 Wash.App. 37, 466 P.2d 201 (1970); Powell Valley Electric Cooperative, Inc. v. United *576 States Aviation Underwriters, Inc., 179 F.Supp. 616 (W.D.Va.1959); Jackson v. Royal Indemnity Co., 172 F.Supp. 241 (D.Mass.1959); James v. Federal Ins. Co., 5 N.J. 21, 73 A.2d 720 (1950); Bresee v. Automobile Ins. Co., 1932 U.S. Av. R. 53-54 (N.D.N.Y.1932). However, a careful examination of each of these cases reveals that they are factually inapposite.
Defendants, on the other hand, cite Great American Ins. Co. v. Bass, 208 Miss. 436, 44 So.2d 532 (1950), wherein an airplane insurance policy extended coverage for risks "not in flight" and the term "flight" was defined as lasting "until completion of the landing run." After landing, the insured's plane was overturned by a gust of wind just as he was about to taxi his plane back to the parking area. The Court held that the plane was not "in flight" at the time of the loss because the insured had completed his landing run. In its opinion, the Mississippi Supreme Court pointed out the distinction between "flight" and "no flight", saying:
"The test of completed flight ought not to be continuing momentum since it requires less than expert knowledge to accept the fact that the landing roll is almost invariably continued without full stop into the taxiing procedures whereby a full and final stop is attained.
"The dividing line, under the policy, between flight and no flight must be found at that stage where the usual hazards of landing, per se, or as a final element of flight technique, have depressed the perils of flight to a minimum comparable to a complete stop. Once the risks of air-borne flight and of ground contact have abated, the pilot regains full control over his plane subject only to ground hazards, whereas in flight he is dominated by dangers which place him in subjection to superior forces. * * * The sudden gusts of wind, although constituting some danger while in flight, were nevertheless here a ground hazard." Id. at 533; See also, Dillard v. Continental Insurance Co., 130 So.2d 489 (La.Ct. App.1961); Acme Flying Service v. Royal Ins. Co., 83 N.Y.S.2d 740 (Sup.1948), aff'd mem. 275 App.Div. 766, 88 N.Y.S.2d 904 (1949).
Applying the above distinction to the present facts, the Court has determined that Showalter completed his landing run once he had finished rolling down the grass runway. The process of taxiing began once Showalter made a 90-degree right turn in order to return the plane to the ramp. It follows, therefore, that the "All Risks Not In Motion" provision of Part III of the insurance policy covered the physical damage which occurred thereafter, and the fact that Showalter, himself, was uninsured becomes irrelevant.
Having determined that the physical damage to Hauck's airplane was covered by Part III, Section G, of the insurance policy, the Court finds that Cotton Belt's payment to CCEC constituted payment on behalf of Hauck for the balance outstanding on the note, and CCEC's subsequent assignment to Cotton Belt is, therefore, unenforceable and invalid. See, United Stores of America, supra.
For the same reasons, the above determinations are controlling in the defendants' counterclaim against Cotton Belt. The proceeds from the insurance have already been effectually paid directly to CCEC in compliance with the terms of the chattel mortgage. Defendants could not recover the proceeds of the insurance policy for damage to their airplane when the payment had already been made to pay their note.
Accordingly, for the above reasons, the Court finds against the plaintiff and in favor of the defendants. With respect to the defendants' counterclaim, the Court finds against the defendants and in favor of the plaintiff.
This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the clerk of the Court is directed to prepare and enter the proper judgment as set out above.
NOTES
[1] Endorsements # 1 and # 3 amend Item 6 to read that coverage afforded by the policy shall apply only "while the aircraft is operated in flight" by "Harold Hauck" or "James H. Heidman" provided they meet certain minimal requirements which are enumerated therein. Those endorsements also extend coverage to "any person" who meets additional, higher requirements which are enumerated therein. Hence, it is a pilot's qualifications and not necessarily the inclusion of his name in the policy which determine whether coverage is extended. Therefore, the language in Item 6 contemplates that uninsured pilots will fly the aircraft. The only effect resulting in such a situation is that coverage would be suspended during that time.
[2] By coincidence, the actual cash value of Hauck's airplane and the amount (reduced by unearned interest) which was outstanding on Hauck's note were one and the same at that point in time.
[3] The parties have not cited and the Court has not found any dispositive Missouri authority.