The AETNA CASUALTY & SURETY COM-
PANY, a Corporation, Appellant,

v.

Rowena B. HAAS and Andrews Exterminat-
ing Company, Inc., a Corpora-
tion, Respondents.

No. 52787.

Supreme Court of Missouri.

No. 2.

Jan. 8, 1968.

Clem W. Fairchild, Herbert M. Kohn, Kansas City, for plaintiff-appellant. Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel.

Max W. Foust and Duke W. Ponick, Jr., of Foust, Moudy & Jacobson, Kansas City, for Rowena B. Haas.

Roger W. Penner of Meyer, Smith, Bott & Penner, Kansas City, for defendant-respondent Andrews Exterminating Co., a Corporation.

PRITCHARD, Commissioner.

Appellant sought to be relieved of liability to pay a judgment in principal amount, $23,081.00, which was rendered upon default against its named insured, respondent Andrews Exterminating Company, Inc., in an issued Comprehensive General Liability Policy of insurance. The grounds asserted for declaratory relief that there is no coverage under the policy are (1) an exclusionary clause of no liability is effective because the explosion (in respondent Haas' private residence which was being fumigated by a fogging insecticide operation) occurred while the residential property was in the "care, custody or control of the insured"; and here (2) the policy specifically excludes coverage when gas of any kind is used by the insured, it being contended that the fogging operation is a use of gas. The trial court denied relief to appellant and found that there was insurance coverage and appellant was liable for said judgment rendered against its insured, Andrews, and further rendered judgment for $1,154.-05 interest on that judgment and for $1,500.00 as expenses and attorney fees incurred in defending the original action upon Andrews' counterclaim for those three items, a total of $25,735.05.

It was stipulated that all depositions taken in the cause would be received in evidence the same as if the witnesses were present in court. The direct testimony in the deposition of George C. Eaden, who performed the fogging operation in Mrs. Haas' residence, was read: He has been in the exterminating business for 38 years, applying insecticide and rodenticide to kill insects and rodents. On Mrs. Haas' house he was using Dyna-Fog equipment to bring a chemical from the liquid to the fog. The machine is taken from place to place inside the house, from the basement up through it. His custom is to start fogging in the basement in the majority of times. A check is first made to see that all windows are closed and that there is no cross-ventilation to take the fog out, and to see that there are no people in the house. When Eaden first went to Mrs. Haas' house, he talked to her a few minutes and went to the basement which he fogged. Mrs. Haas was still in the kitchen, the last place he was going to fog, when he started the fogging machine. He presumed that he told Mrs. Haas to leave the house, "because it was understood she would have to be out." He told her she would have to be out because the fog would be too strong for her. Mrs. Haas was in the kitchen when he finished the basement and went upstairs; she was gone when he came back down again. She was instructed that she would have to stay out of the house four or five hours. Eaden came down the front stairs from the second floor, worked the front part of the house, and then toward the rear where he was going to exit from the rear door, which was closed. He was in a little alcove when the explosion occurred. He went to the neighbor's house where he saw Mrs. Haas. Eaden's further deposition testimony (objected to at the trial on the ground that questions called for conclusions and invaded the province of the court) was that as long as he was doing the job he could take whatever steps were necessary to seal up the house and do the job right, and while he was there he could do as he pleased in those regards; that from his long years of experience in the field, if someone walked in the house he could have told them to leave, "Yes, I have the privilege to stop anyone from coming in." He had the privilege to take whatever steps were necessary to do the job right and protect the

health and safety of others. If Mrs. Haas had wanted to come in while he was fogging the house he would have stopped her, or anyone else, if he had already fogged the upstairs and part of the first floor. Many times he just hooked the screen so that persons could not come in while he was upstairs—to keep someone from coming in he felt it was his prerogative and part of what he should do.

Mrs. Haas' deposition testimony is that when she left the house she left Eaden there by himself; she assumed that he could do whatever was necessary to properly do the job—he could open and close windows, doors, or drawers or "whatever he wanted to do." So far as she knew he could put the fog anywhere he wanted; she expected him to exercise whatever functions he had to inside the house to do his work properly; with respect to going back in the house or when she could go back in she would look to Eaden for advice; she left it all up to him. At the time of the explosion, Mrs. Haas was sitting in a neighbor's house, to the rear of her house, drinking coffee. She saw the roof of her house lift up about a foot. When Eaden commenced the fogging operation Mrs. Haas was in her own home washing dishes in the kitchen. She remained in the house while Eaden fogged the basement and the second floor, and when the odor got so bad it was hurting her throat she said to Eaden, "I believe I'll go to the neighbors, because the odor is so bad." Eaden did not tell her to leave; he did not tell her that once he started putting in the fog it would be dangerous to her. She called the Andrews office to arrange the fogging and told them she wanted it done while she was at home. She did not give Eaden the key to the house, but had it with her when she went over to the neighbor's house. She told him that as soon as he was through spraying to let her know and she would lock the house and then go on to work. She had not been at the neighbor's house very long when the explosion occurred.

Appellant contends that paragraph J of the exclusions of the policy is applicable: "This policy does not apply: (J) under coverage D, to injury to or destruction of (1) property owned or occupied by or rented to the insured, or (2) except with respect to liability under sidetrack agreements covered by his policy, property used by the insured, or (3) except with respect to liability under such sidetrack agreements or the use of elevators or escalators at premises owned by, rented to or controlled by the named insured, *property in the care, custody or control of the insured or property as to which the insured for any purpose is exercising physical control,* * * *." (Emphasis added to the phrase relied upon by appellant.) The trial court made a finding and conclusion that this clause is ambiguous and that "a practical construction of the contract of insurance in favor of coverage has been made by the plaintiff insurance company by paying a prior, similar type loss under identical policy provisions without invoking the exclusions which are relied upon in this action." The evidence upon which the trial court's action is based is that on an identical Comprehensive General Liability policy (of which the instant policy is a renewal without further reservation, restriction or insertion of clarifying exclusion) appellant in 1960 paid a loss occasioned by Andrews' damage to property of one E. J. Sweet totalling $679.-38, wherein Andrews was spraying for silverfish in a home and the insecticide left a residue upon the wallpaper and furniture. Mr. William H. Lillis, a partner in the agency issuing Aetna's policies, testified that the manual classification for the premium to be charged was selected knowing the kind of work Andrews was in. After the loss was occasioned to Mrs. Haas' residence, appellant's adjuster, Michael G. Zipkin, advised Raymond E. Beaird, owner of Andrews, that the policy covered the Haas loss. Zipkin, on May 31, 1962, wrote to Beaird and requested that he write a letter (the form of which was enclosed by Zipkin) to the manufacturer and distributor of the Dyna-Fog machine advising that

Andrews would look to it for indemnity for the Haas loss. Beaird did send a letter in modified form to that manufacturer. Appellant denied coverage for the Haas loss on July 12, 1962, on the *sole* ground of said Exclusion J relating to care, custody and control. In a subsequent meeting with Lillis, Zipkin was told by Lillis that he felt the loss was covered by the policy for two reasons: that the prior Sweet loss was paid by appellant (indicating coverage for a following similar loss) and that the nature of the work performed by Andrews was such that if a care, custody and control exclusion would be applied they would have no real benefit under the policy, "Helm (Mr. Lillis) still feels there is coverage. He says if there is no coverage why does Andrews need our policy, since all his work is done in a home in which, according to us, he has care, custody and control." No point is here made relative to the admissibility of any of this evidence.

Appellant says Exclusion J is not ambiguous, and is therefore not open to construction and the trial court erred in finding that the clause is ambiguous.

The clause in question is not patently ambiguous so that extrinsic evidence may not be resorted to to resolve the uncertainty. Rather, there exists a *latent* ambiguity with respect to what the exclusions are applicable, and with respect to what coverage is afforded the insured under the general insuring provisions of the policy. In this case the appellant by its policy undertook to afford insurance to the Andrews Exterminating Company, Inc., "To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident." Under Condition 4. Limits of Liability—(c) Aggregate—Coverage D., it is stated, "Subject to the limit of liability with respect to 'each accident', the limit of property damage liability stated in the declarations as 'aggregate operations' is the total limit of the Company's liability for all damages arising out of injury to or de-

struction of property, including the loss of use thereof, caused by the ownership, maintenance or use of premises *or operations* rated on a remuneration premium basis or by contractors' equipment rated on a receipts premium basis." (Italics added.) It seems quite clear that the general insuring agreements, as written, afforded coverage to Andrews' operations—an exterminating business. The latent ambiguity becomes pronounced when one attempts to discover to just what property the "care, custody and control" exclusion was meant to apply. The clause is uncertain as to its application, and as applied to the facts and circumstances is susceptible to more than one interpretation. Of strong significance is the manner in which appellant's agents and claims representative treated the clause. First, appellant through its agent, Lillis, had knowledge of the type of operation of Andrews Exterminating Company, Inc. That company, as the evidence shows, had done exterminating work for Lillis. Second, a previous loss occasioned by damage to property during an exterminating operation in the private residence of E. J. Sweet was paid. The policy covering that loss was renewed in the same form—without any clarifying language of Exclusion J. Appellant's adjuster or claims representative advised that there was coverage for the Haas loss, and requested Beaird (Andrews' owner) to write a demand letter of indemnification for the loss to the manufacturer and distributor of the Dyna-Fog machine. Zipkin, the adjuster for appellant, and Lillis, its policy agent, both advised Andrews that there was coverage under the policy for the loss. These facts and circumstances fall within those of the case of Meiser v. Aetna Casualty and Surety Co., 8 Wis.2d 233, 98 N.W.2d 919, where the facts showed that the insurer was uncertain as to application of the exclusion clause in that its agent first thought there was coverage and advised the insured to file a claim. Later, after discussing the matter with the insurer, the agent advised the insured that he had coverage; and a month later, after discussing the claim with a lawyer-investigator, the insurer notified the in-

sured that the loss was excluded from coverage. It was held that these facts indicated that the insurer and its agent were not at any time sure of the construction that should be placed on the exclusion clause, and the same was entirely inconsistent with its contention that the phrase was unambiguous.

■ Of further strong significance, and as urged by respondents, is the fact that appellant placed a practical construction of coverage under the policy by paying a like property damage loss under a prior identical policy. That construction was against its interest, and will be given great weight in ascertaining the intention of the parties to the contract. State ex inf. McKittrick, Atty. Gen., ex rel. City of Springfield v. Springfield City Water Co., Banc, 345 Mo. 6, 131 S.W.2d 525, 532 [6, 7], "Moreover, in construing an ambiguous contract we have a right to consider the practical construction placed thereon by the acts and conduct of the contracting parties, and such construction is of the greatest weight in determining its true meaning." That practical construction of coverage under the policy is and should be binding upon appellant. Leggett v. Missouri State Life Insurance Company, Mo., 342 S.W.2d 833, 852 [14–18]; Landau v. Laughren, Mo., 357 S.W.2d 74, 80 [2]; Norman v. Durham, Mo., 380 S.W.2d 296, 300 [3]; and Robson v. United Pacific Insurance Company, Mo., 391 S.W.2d 855, 861. See Haseltine v. Farmers' Mut. Fire Ins. Co., Mo., 263 S.W. 810, 813 [4, 5], where an insured was held to his construction of a contract of insurance by paying himself one-fourth the cost of repairs on a previous loss as against his contention on appeal that the insurer was liable for the amount of the policy, not just three-fourths of the value of the property; and Fuller Bros. Toll Lumber & Box Co. v. Fidelity & Casualty Co. of New York, 94 Mo.App. 490, 68 S.W. 222, where the loss for a previous injury to an employee from an elevator was paid, it being claimed that injury from the elevator was excluded for a subsequent injury to the employee. It was

said, 68 S.W. 223, "We are thus furnished with the indubitable evidence of the meaning the defendant assigned to the policy. As said in St. Louis Gaslight Co. v. City of St. Louis, 46 Mo. 121, 'In a case of that kind, whose interpretation should prevail? If the court gives one differing from that understood by the parties, it, in effect, makes a new contract,—the very thing most to be avoided. If it leaves the parties to be governed by their understanding of their own language, it, in effect, enforces the contract actually made. That they should be so permitted to construe their own agreement accords with every principle of reason and justice.'" For further application of the rule of practical construction of a contract, see New Amsterdam Casualty Co. v. Mesker, 128 Mo.App. 183, 106 S.W. 561, 567, and Tomnitz v. Employers' Liability Assur. Corporation, 343 Mo. 321, 121 S.W.2d 745, 751. The existence of the foregoing facts and circumstances showing that appellant practically construed the exclusion clause as not applicable to Andrews' operation distinguishes this case from International Derrick & Equipment Company v. Buxbaum (C.A. 3rd Cir.), 240 F.2d 536; Maryland Casualty Company v. Holmsgaard, 10 Ill. App.2d 1, 133 N.E.2d 910; and those cases attempting to construe exclusion clauses such as this as collected in the annotation, 62 A.L.R.2d 1242. The observation is made, however, at page 1244 of that annotation: "Generally speaking, no rule of general application can be deduced from the cases, aside from the rather obvious statement that the general principle that insurance policies, having been prepared by the insurer, must be construed most strongly against it and in favor of the insured, fully applies to the kind of exclusion clause discussed here."

■ If doubt existed on appellant's part at the time of issuance of the first policy to Andrews, or if doubt existed at the time it renewed the first policy (knowing the nature of Andrews' exterminating business operation, and having paid a similar property damage loss), it would have been a simple matter for it to have spe-

cifically and with clarity excluded residential or other buildings where Andrews was performing its services from coverage. "Exclusion clauses are strictly construed against the insurer, especially if they are of uncertain import. An insurer may, of course, cut off liability under its policy with a clear language, but it cannot do so with that dulled by ambiguity. As with the provisions of the policy as a whole, so also with the exceptions to the liability of the insured, the language must be construed so as to give the insured the protection which he reasonably had a right to expect; and to that end any doubts, ambiguities and uncertainties arising out of the language used in the policy must be resolved in his favor." Boswell v. Travelers Indemnity Co., 38 N.J.Super. 599, 120 A.2d 250, 253, 254. Accord: Rieger v. London Guarantee & Accident Co. of London, England, 202 Mo.App. 184, 215 S.W. 920, 927 [3]; Cloughly v. Equity Mut. Ins. Co., Mo., 243 S.W.2d 961, 964 [2], and cases cited.

■ Appellant contends that it has no liability to respondents because the policy contains a second exclusion from coverage: "Excluding the Use of Gas of any Kind." That phrase appears upon an attached sheet of paper entitled "General Liability Schedule." Under "(E) Contractual" appears the typed-in wording, Exterminators—Including Termite Control—Including Completed Operations—Excluding the Use of Gas of any Kind." Following that appears a code number and certain figures for premium bases, rates and advance premium. Without doubt, the information contained on this sheet refers to rating classifications. It is further stated on this sheet in print, "The rating classifications stated herein, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy." The use of gas as an exclusion is not specifically mentioned anywhere else in the policy. The plain words of the rating classification sheet show that it is not applicable to modify the insuring agreement. Besides, appellant did not initially

deny coverage because of any claimed exclusion in the use of gas. That claim was first made when at the trial appellant amended its petition by leave of court to include the general allegation that there was no coverage under "other exclusions" in the policy additionally to that of Exclusion J. Appellant first denied coverage on the sole basis that there was no coverage because the property was in the care, custody and control of the insured under Exclusion J. It may not therefore assert a later different ground for denial of liability. State Farm Mut. Auto. Ins. Co. v. Central Sur. & I. Corp., Mo.App., 405 S.W. 2d 530, 532 [1, 2], and cases cited.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM: The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.