**CHARTER OIL COMPANY, et al., Appellants,**

v.

**AMERICAN EMPLOYERS' INSURANCE COMPANY, et al., Appellees.**

No. 94–7175.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1995.

Decided Nov. 14, 1995.

Finley T. Harckham, with whom John H. Gross and Jerold Oshinsky, Washington, DC, were on the briefs, argued the cause, for appellants Charter Oil Company, et al.

James E. Rocap, III, with whom Niki Kuckes, Dennis M. Flannery, William J. Bowman, Dustin P. Finney, Jr., Steven G. Adams, Washington, DC, Andrew S. Amer, New York City, Arthur F. Sampson, III, Susan M. Muchmore, Lawrence E. Carr, Jr., Margaret H. Warner, Kyle A. Kane, Richard H. Gimer, Kathryn A. Underhill, Lisa B. Zucker, James P. Schaller, Timothy R. Dingilian, and James W. Greene, II, Washington, DC, were on the briefs, argued the cause, for appellees Aetna Casualty & Surety Co., et al.

Robert E. Heggestad, Washington, DC, filed the brief, for appellee Harbor Insurance Company.

Martin R. Baach, Washington, DC, filed the brief, for appellee Lloyd's London, et al. Michael Nussbaum, Washington, DC, entered an appearance.

Peter D. Coppelman, Acting Assistant Attorney General, Anne S. Almy, Steven R. Baer, and Evelyn S. Ying, Attorneys, United States Department of Justice, were on the brief, for amicus curiae United States of America.

Laura A. Foggan and Daniel E. Troy, Washington, DC, were on the brief, for amicus curiae Insurance Environmental Litigation Association.

S. Robert Sutton, North Potomac, MD, entered an appearance, for amicus curiae Transamerica Insurance Group.

Before: BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

In the early 1970s Independent Petrochemical Corporation ("IPC"), a wholly-owned subsidiary of plaintiff Charter Oil, was in the business of selling petrochemical products. As a courtesy to a customer, it arranged on several occasions for the disposal of waste oil by a St. Louis waste oil hauler, Bliss Oil, understanding that Bliss would take the oil to a waste disposal site. In fact, after Bliss Oil's president tasted the oil to check its suitability for other uses and found the flavor fit, Bliss sprayed it as a dust suppressant at various locations throughout Missouri. The sprayings occurred over a period of at least two months, with each spraying lasting about 30–40 minutes. The waste oil turned out to contain dioxin, a chemical compound alleged to cause harm to humans, animals, and plants.[1] The discharge of the dioxin-contaminated oil gave rise to claims against IPC by the federal government, the State of Missouri, and over 1,600 private plaintiffs, the latter seeking in aggregate $4 billion in compensatory damages and the same amount in punitive damages. IPC entered into settlements covering all of the claims and is now in bankruptcy. Its outstanding obligations include over $100 million owed to the federal government for clean-up of various sites in Missouri.

Charter and its affiliates (including IPC) sued several primary and excess insurers that had issued comprehensive general liability policies to them over the 1971–1983 period, seeking a declaratory judgment that these policies obliged the insurers to provide indemnification for all obligations arising out of Bliss's spraying activities. Each of the policies at issue contains one of four forms of pollution exclusion; three of the forms, on which the parties have focused, create an exception to the exclusion—i.e., affirmatively cover—harm from pollution releases that are

---

1. The issue whether dioxin causes cancer in humans is highly controversial. See, e.g., Richard Stone, "Panel Slams EPA's Dioxin Analysis," 268 *Science* 1124 (May 26, 1995) (reporting critique by the EPA's Science Advisory Board).

"sudden and accidental." The first form (termed the "domestic insurers' exclusion" by the district court) provides:

> [This insurance does not apply to] [b]odily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*

Joint Appendix ("J.A.") at 5067H (emphasis added). The second and third forms (the "London exclusion" and the "INA exclusion") are identical in all relevant respects. The fourth form, contained in policies issued by defendant Travelers, replaces the "sudden and accidental" language with a requirement that the discharge of pollutants be neither "expected" nor "intended."

In the decision under review here, the district court granted the insurers' motion for summary judgment on claims governed by Missouri law. *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 842 F.Supp. 575 (D.D.C.1994). The court's key ruling was that the phrase "sudden and accidental" is unambiguous and means "unexpected, unintended, and abrupt." *Id.* at 579–80. This appeal followed. We affirm, rejecting Charter's contentions that the phrase "sudden and accidental" is sufficiently ambiguous to allow recovery for the injury from Bliss's sprayings and that representations made to state insurance regulators when insurers introduced the pollution exclusion create a public policy bar to its enforcement as interpreted by the district court.

Although all parties agree that Missouri law controls, we have no ruling from the Missouri courts interpreting "sudden and accidental." See *Independent Petrochemical Corp.*, 842 F.Supp. at 578. Other circuits have certified questions to state supreme courts concerning the interpretation of the pollution exclusion, e.g., *Claussen v. Aetna Casualty & Sur. Co.*, 865 F.2d 1217, 1220 (11th Cir.1989), but that solution is not available here because the Missouri Supreme

Court declines to answer questions certified to it by federal courts. See *Harber v. Altec Indus., Inc.*, 5 F.3d 339, 340 (8th Cir.1993); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 944 F.2d 940, 944 (D.C.Cir.1991).

## I.

### A. *"Sudden and Accidental."*

■ Charter argues, first, that the phrase "sudden and accidental" is facially ambiguous and thus, under standard principles of insurance law and specifically those of Missouri, *Peters v. Employers Mutual Casualty Co.*, 853 S.W.2d 300, 302 (Mo.1993); *Krombach v. Mayflower Ins. Co.*, 827 S.W.2d 208, 210 (Mo.1992), should be interpreted to embrace rather than exclude coverage. Second, it argues that even if the phrase is not facially ambiguous, extrinsic evidence reveals a "latent ambiguity," which (unless clearly resolved by extrinsic evidence in favor of the insurer) again requires an interpretation favoring coverage.

#### 1. *Facial Ambiguity.*
##### a. *The Anti-redundancy Canon.*

Charter says that "sudden" is ambiguous in that it may be interpreted to mean either "unexpected and unintended" (the interpretation favored by Charter) or "unexpected, unintended, and abrupt" (the interpretation favored by the insurers and adopted by the district court). In support of its position, Charter points to dictionary definitions of "sudden" that emphasize the element of unexpectedness and downplay or ignore that of abruptness. E.g., *Webster's Third New International Dictionary* 2284 (1981) (listing, as the first definition of "sudden," "happening without previous notice or with very brief notice: coming or occurring unexpectedly: not foreseen or prepared for"). The district court rejected Charter's interpretation, relying heavily on the Eighth Circuit's construction of Missouri law in *Aetna Casualty & Sur. Co. v. General Dynamics Corp.*, 968 F.2d 707 (8th Cir.1992). There the court held that the word "sudden," when joined with "accidental," imposes a requirement of temporal abruptness. *Id.* at 710. To rule

otherwise, it said, would render "sudden" superfluous in the phrase "sudden and accidental," since "accidental" already imposes a requirement of unexpectedness. *Id.* Missouri law requires that all terms of an insurance contract be given meaning; thus, "sudden" cannot mean merely unexpected. *General Dynamics,* 968 F.2d at 710. Rather, under Missouri law's dictate that policy language be given its plain meaning, "sudden" must mean "quick" or "abrupt." *Id.*

■ Under the "home circuit" rule of *Abex Corp. v. Maryland Casualty Co.,* 790 F.2d 119, 125–26 (D.C.Cir.1986), we "defer to the local circuit's view of the law of a state in its jurisdiction when that circuit has made a reasoned inquiry into state law, unless we are convinced that the court has ignored clear signals emanating from the state courts." Judges of the home circuit are likely to be more experienced in the law of states within their circuit than are outsiders; and, as diversity cases calling for application of a state's law are likely to arise predominantly within the circuit including the state, such deference makes for uniform results taking advantage of that expertise. *General Dynamics* therefore controls our interpretation of "sudden and accidental" unless we conclude that the court "clearly misread" Missouri law. *Abex,* 790 F.2d at 126. As rulings in this very litigation show, our deference under *Abex* is not slavish. Thus, in *Independent Petrochemical Corp.,* 944 F.2d at 944–47 (D.C.Cir.1991), we refused to defer to the Eighth Circuit's conclusion that the term "damages" in the standard-form comprehensive general liability policy did not include environmental clean-up costs. We noted that the Eighth Circuit's decision was at odds with every other case applying the rules of insurance contract interpretation in force in Missouri, and we concluded that the decision presented the "rare" case in which *Abex* deference was not warranted. *Id.* at 945, 946.

The present appeal does not present such a case. First, the *General Dynamics* court's determination that "accidental" includes an element of unexpectedness, 968 F.2d at 710, is based on many cases so deciding, in Missouri and elsewhere. E.g., *N.W. Elec. Power Co-op. v. American Motorists Ins. Co.,* 451 S.W.2d 356, 363–64 (Mo.Ct.App.1969); *White v. Smith,* 440 S.W.2d 497, 507–509 (Mo.Ct. App.1969); *St. Paul Fire & Marine Ins. Co. v. Northern Grain Co.,* 365 F.2d 361, 364 (8th Cir.1966) ("[T]he courts are practically agreed that the words 'accident' and 'accidental' mean that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen.") (internal quotation marks and citation omitted). Charter has not pointed to any Missouri case interpreting "accidental" in a way that excludes the unexpected.

*General Dynamics*'s use of the anti-redundancy canon is also consistent with Missouri caselaw. E.g., *Brugioni v. Maryland Casualty Co.,* 382 S.W.2d 707, 712 (Mo.1964); *State Mut. Life Assur. Co. of Worchester v. Dischinger,* 263 S.W.2d 394, 401 (Mo.1953). Charter points out that the cases applying the anti-redundancy canon all involve potentially redundant *clauses,* not individual words. Indeed, for the drafters of language excluding coverage for damages arising out of the "discharge, dispersal, release or escape" of "smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants, or pollutants" to argue against redundancy of individual words in insurance policies may seem odd—although, of course, it is possible that over a broad set of applications each word may add a critical element. In any event, we agree with defendants that in the context of the simple pairing, "sudden and accidental," as distinguished from a laundry list of terms ("discharge, dispersal, release or escape"), application of Missouri's anti-redundancy canon is not a "clear misreading" of Missouri law. Cf. *American Family Mutual Ins. v. Pacchetti,* 808 S.W.2d 369, 370–71 (Mo.1991) (en banc) (mentioning but not resolving argument that anti-redundancy canon should be applied in the paired use of "expected" and "intended," and observing, "We could note many examples of legal parlance in which studied redundancies are used, but there are many suggestions of a shade of difference in the meaning of the two terms.").

The application of anti-redundancy reasoning in *General Dynamics* is consistent with other cases interpreting "sudden and accidental." As the Tenth Circuit said in concluding under Utah law that "sudden" had a meaning distinct from that of "accidental": "Dictionaries may indicate each word has several overlapping meanings. We cannot use only the redundant definitions, however." *Hartford Accident & Indemnity Co. v. United States Fidelity & Guaranty Co.*, 962 F.2d 1484, 1489 (10th Cir.1992). Indeed, if the effect of the rule that ambiguities are construed against the insurer were to force the interpreter always to choose the redundant meaning from among a dictionary's offerings, it would be quite difficult for insurance policies to exclude members of a set of closely related circumstances. ("Abrupt" wouldn't work here, for example, as *Webster's Third New International* includes "unexpected" as one of *its* meanings.) See also *Northern Ins. Co. v. Aardvark Assocs., Inc.*, 942 F.2d 189, 192 (3rd Cir.1991) (reading "sudden," where joined with "accidental," as conveying more than unexpectedness, on the ground that to do otherwise "would render the suddenness requirement mere surplusage."); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 704 (Fla.1993) (similar); *Lumbermens Mutual Casualty Co. v. Belleville Indus., Inc.*, 407 Mass. 675, 555 N.E.2d 568, 572 (1990) (similar). The congruence of *General Dynamics* with other decisions applying the anti-redundancy canon in interpreting "sudden and accidental" stands in sharp contrast to the Eighth Circuit's departure from other courts' conclusions in the decision to which we declined to accord *Abex* deference. See *Independent Petrochemical Corp.*, 944 F.2d at 944–47.

Having determined that "sudden" must mean something other than "unexpected," the *General Dynamics* court went on to hold that the term's "plain meaning" is "abrupt." 968 F.2d at 710. We find no "clear misreading" of Missouri law in this second interpretive step. Under that law, the language of an insurance policy is to be given "the meaning that would ordinarily be understood by the layman who bought and paid for the policy." *Robin v. Blue Cross Hosp. Serv., Inc.*, 637 S.W.2d 695, 698 (Mo.1982) (en banc) (internal quotation marks and citation omitted); see also *Independent Petrochemical Corp.*, 944 F.2d at 945 (discussing Missouri's principles of insurance contract interpretation). Other courts applying this interpretive canon to the "sudden and accidental" language have concluded with the *General Dynamics* court that "sudden" means "abrupt." See *Smith v. Hughes Aircraft Co.*, 22 F.3d 1432, 1437 (9th Cir.1993) (stating that the "clear and explicit meanings of insurance contract provisions, interpreted in their ordinary and popular sense," control interpretation under California law, and concluding that " 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature") (internal quotation marks and citations omitted); *Hartford Accident & Indemnity Co. v. United States Fidelity & Guaranty Co.*, 962 F.2d 1484, 1487, 1489–90 (10th Cir.1992) (holding under Utah law that "sudden" connotes abruptness and, therefore, precludes coverage for discharges occurring over lengthy periods; "We accord insurance terms their ordinary usage and connotations,...."); *United States Fidelity & Guaranty Co. v. Star Fire Coals, Inc.*, 856 F.2d 31, 33–34 (6th Cir.1988) (similar); *Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.*, 636 So.2d 700, 704 (Fla.1993) (similar). Again this agreement of *General Dynamics* with other courts marks a clear difference from the situation before us in *Independent Petrochemical Corp.*

Further, even apart from the redundancy problem, reading "sudden" to mean only unexpected presents serious difficulties. In advocating that reading, for instance, the Supreme Court of Georgia reasoned: "[O]n reflection one realizes that, even in its popular usage, 'sudden' does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death." *Claussen v. Aetna Casualty & Sur. Co.*, 259 Ga. 333, 380 S.E.2d 686, 688 (1989). The instances cited seem unconvincing. A "sudden turn" connotes an abrupt change in direction, one that might still be described as "sudden" by a driver who had traveled the road many times and knew to expect the turn. Likewise, the other

two usages seem likely in fact to apply only where the event is abrupt—a spike in an imaginary graph rather than a gentle slope—and any unexpected character seems in large part merely a typical concomitant of the event's being abrupt. A sudden death presumably refers to the *process* itself (not the moment when, say, the heart stops or brain waves cease, a moment that will always be more or less instantaneous), and is implicitly contrasted to a lingering death (as from most forms of cancer); the death is, then, of short duration. And while "sudden storms" may in common parlance usually arise abruptly, they also typically end quickly; we doubt if Noah referred to the rain that necessitated his ark as a "sudden storm," no matter how abruptly it may have started.

### b. *Purpose of Policy Term.*

Putting canons aside, Missouri courts in interpreting insurance contracts look to the underlying commercial or legal purpose sought to be achieved by a policy term. See *Weathers v. Royal Indemnity Co.*, 577 S.W.2d 623, 626 (Mo.1979) (en banc) (looking to purpose of statutory mandate with which policy had to comply); *Aetna Casualty & Sur. Co. v. Haas*, 422 S.W.2d 316, 319 (Mo. 1968) (relying in part on presumed utility of policy to insured in interpreting contested language). And the "abruptness" interpretation of "sudden" fits well with what is at least a plausible business purpose for the restriction of coverage to "sudden and accidental" releases. That restriction may serve as a back up to the requirement under standard "occurrence" policies that the harm be "unexpected and unintended," denying coverage for damages that *may* have been expected or intended, or at least are more likely to be such, but which cannot *readily* be proven as such. See Kenneth S. Abraham, *Environmental Liability Insurance Law* 153 (1991). Discharges of long duration seem more likely than ones of short duration to be part of the insured's ordinary operations and hence

more likely to produce harm that is expected or intended by the insured (where avoidance of the harmful discharge would be costly). Such long-term discharges, characteristically (though not always) expected and avoidable, were likely the model of pollution-causing activity in the late 1960s and early 1970s, before the initiation of intensive federal regulation of waste storage and management in 1980. See Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767 (codified as amended at 42 U.S.C. §§ 9601–9675). The impossibility of pinpointing every instance of expected or intended harm means that in the absence of an additional requirement that the discharge be abrupt, the insured would recover in some situations in which it in fact expected or intended the harm. Yet both insured and insurer have an incentive, at the contracting stage, to rule out such liability. If a policy allows recovery for discharges that expectedly or intentionally generate liability, insureds will be tempted (at the margin) to engage in harm-generating (or reckless) behavior, i.e., will be subject to "moral hazard." To the extent that the moral hazard is not constrained, total compensable losses will be increased by a number of reasonably avoidable losses, and premiums, of course, will rise with them. Thus, the imposition of an abruptness requirement may plausibly be viewed as aimed at controlling moral hazard and thereby benefitting both parties.

Of course, suddenness is only an imperfect mechanism for identifying harm that the insured neither expected nor intended. Here, the suddenness of Bliss's discharge presumably has little if any bearing on whether the resulting harm was expected or intended *by Charter*. By definition, however, a proxy only approximates the underlying item of interest. The absence of a perfect fit therefore provides no basis for refusing to apply the proxy or for distorting its meaning.[2]

---

**2.** Abraham, *supra*, at 153–55, also suggests that a requirement of sudden *onset*—as distinguished from a requirement of limited duration—might help to control moral hazard. His argument seems to be that a sudden onset, or "boom," alerts all to the occurrence of the discharge and thus allows the insurer to enforce a duty to

mitigate on the part of the insured. In contrast, when a discharge begins gradually it will be difficult to enforce any duty to mitigate, and that duty will be subject to moral hazard. A requirement of sudden onset might help to control this moral hazard problem. *Id.* We are somewhat skeptical of this analysis. First, enforcement of a

### c. *Historical Interpretation.*

Charter argues that *Abex* deference to *General Dynamics* is unjustified in light of the courts' historic interpretation of "sudden and accidental" language in boiler and machinery policies, and indeed two courts have been persuaded that the language acquired an established meaning in the boiler and machinery context. See *New Castle County v. Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1197 (3rd Cir.1991) ("The phrase 'sudden and accidental' was not new to the insurance industry. For many years, it had been used in the standard boiler and machinery policy, and the courts uniformly had construed the phrase to mean unexpected and unintended.") (footnotes and citations omitted); *Queen City Farms, Inc. v. Central National Ins. Co. of Omaha,* 126 Wash.2d 50, 882 P.2d 703, 720–21 (1994) (en banc) (concluding, in reliance on reasoning in case involving boiler and machinery policy, that "sudden and accidental" means "unexpected and unintended"). But Charter and the courts adopting that argument rely on only two cases. Two hardly make a massive trend, and in fact each of the two cases has a significant vulnerability as authority. The first, *New England Gas & Elec. Ass'n v. Ocean Accident & Guarantee Corp.*, 330 Mass. 640, 116 N.E.2d 671, 680 (1953), involved an event of very brief duration, rendering the interpretation of "sudden" immaterial to the result. The court specifically rejected the notions that the insured's spindle, over its final 75 minutes of operation, "was merely undergoing only slow and gradual structural changes" and that its cracking "was gradual and not sudden." The second case, although rejecting a requirement of limited duration, actually used reasoning that resonates with the discussion of moral hazard above, and thus supports rather than undermines the *General Dynamics* result:

> It seems to us that the risk to the insurer would be the same, whether a break was instantaneous or began with a crack which developed over a period of time until the final cleavage occurred, *as long as its progress was undetectible* [sic]. On the other hand, the insured should not be permitted to proceed recklessly and hold the insurer liable for damage *if it had been forewarned of a possible break and could have taken steps to forestall it or avoid an interruption of business resulting therefrom.*

*Anderson & Middleton Lumber Co. v. Lumbermen's Mutual Casualty Co.*, 53 Wash.2d 404, 333 P.2d 938, 940–41 (1959) (emphasis added). The court thus saw a relationship between abruptness and the insured's lack of capacity to prevent an accident but failed to notice that an independent requirement of abruptness might serve the parties' basic goals. In short, the boiler and machinery policy precedents provide almost no support for Charter's preferred analysis.

### 2. *Latent Ambiguity.*

Charter argues that even if "sudden and accidental" is not facially ambiguous, the insurers' prior claims behavior and representations made to state insurance regulators reveal a latent ambiguity in the phrase. Latent ambiguity can arise where language, clear on its face, fails to resolve an uncertainty when juxtaposed with circumstances in the world that the language is supposed to govern. See *AM Int'l, Inc. v. Graphic Management, Inc.*, 44 F.3d 572, 575 (7th Cir.1995). Thus, for example, the contract in *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng.Rep. 375 (Ex.1864), which called for the shipment of goods on the ship *Peerless,* was "[c]lear as a bell" on its face, 44 F.3d at 575, but desperately ambiguous when it turned out there were two or more ships of that name. Evidence of the state of the world to which a contract is to be applied is necessarily admissible to *reveal* a latent ambiguity, as Missouri

---

duty to mitigate would seem to require complex knowledge about a wide range of factors other than simply the onset of the discharge, such as the costs and benefits of each possible corrective measure. Second, even in terms of identifying the onset, we suspect that in many cases the insured's failure to take action in response to a discharge that begins with a whimper rather than a bang would be due to its ignorance of the event rather than to its shirking the duty to mitigate. If the set of cases in which insureds would fail to mitigate gradually-beginning discharges of which they are aware is small, then coverage of harms resulting from such discharges would not create any significant moral hazard problem.

courts clearly recognize. See *Royal Banks v. Fridkin,* 819 S.W.2d 359, 362 (Mo.1991) (en banc); *Aetna Casualty & Sur. Co. v. Haas,* 422 S.W.2d 316, 319 (Mo.1968). Once the latent ambiguity is thus established, a broader range of extrinsic evidence may be admitted to *resolve* it, including (in Missouri) otherwise inadmissible evidence of the circumstances surrounding the parties' entry into the contract, *Fridkin,* 819 S.W.2d at 362, and of the behavior of the parties with respect to similar contracts, *Haas,* 422 S.W.2d at 319. While we do not read these cases as indicating that Missouri allows such a broad range of extrinsic evidence to establish an ambiguity, we will assume it does, for even under that assumption Charter's extrinsic evidence is inadequate.

■ Charter first points to evidence of the payment by certain (unspecified) defendants of the initial claims against Charter and its affiliates arising out of Bliss's spraying. The insurers paid, in aggregate, $2.8 million, a tiny fraction of Charter's ultimate liability. J.A. 999. Charter argues that the payment of the initial claims places a practical construction on the parties' agreement, one that the defendants are not now free to ignore. The defendants respond that the decision by an individual claims representative to pay a single claim or a small number of claims should not, without more, bind the insurer to an interpretation under which the insured is covered for all similar claims. (A fortiori, one insurer's claims behavior should not bind other insurers.) We agree with the defendants. A contrary holding would require that an insurer, before paying modest claims such as the initial claims by Charter here, conduct an investigation in far greater depth than the amount at stake would justify, simply to avoid the risk of massive exposure down the road. Charter correctly notes that the decision to uphold coverage in *Haas* was based in part on the prior claims behavior of the insurer. 422 S.W.2d at 319–20. However, as Charter acknowledges, see Reply Brief at 14, the court in *Haas* recognized an independent ground for the decision—the fact that a contrary holding would have eviscerated the only imaginable purpose of the insurance policy. See 422 S.W.2d at 319.

■ The second sort of extrinsic evidence proffered by Charter concerns representations made to insurance regulators (and contemporaneous internal memoranda) regarding the scope of the pollution exclusion. Again we assume that such evidence might in some circumstances establish a latent ambiguity in the pollution exclusion, but we find that none of the evidence proffered rises to the level of suggesting material inconsistency between the representations or internal memoranda and the policy language as interpreted in *General Dynamics.*

In this category Charter points first to the insurers' representation that the newly introduced pollution exclusion merely "clarified" existing coverage. The insurers stated in various fora that because damages from pollution tended to be expected or intended and thus excluded from coverage by virtue of the threshold requirement for coverage under standard occurrence policies, the effect of the pollution exclusion was merely to "clarif[y] th[e] situation so as to avoid any question of intent." J.A. 5067F; see also J.A. 5024–5025 (testimony of David E. Kuizenga) (interpreting insurers' explanation of the pollution exclusion); J.A. 5069A–5069B (testimony of James C. Schmitt) (stating that a coverage-reducing exclusion would have encountered substantial regulatory resistance in Missouri in 1970). According to Charter, this evidence demonstrates that the "sudden and accidental" language in the pollution exclusion, even if clear on its face, was not interpreted or understood to impose conditions beyond the traditional "unexpected and unintended" requirement. But the addition of "clarifying" language necessarily implies *some* element of change; presumably some cases, whose classification was in doubt before the change, can afterwards be classified with certainty. Moreover, in the context of insurance policies, where ambiguous language is construed against the insurer, a clarification that yields *any* wins for the insurer (out of the set of formerly ambiguous cases) represents a slight curtailment of the former theoretically available coverage. And here the emphasis is properly on theoretical availability. The record evidence, undisputed by Charter, shows that pollution claims

were far less common and far less broad in scope in the era in which the pollution exclusion was drafted than they are today. E.g., Supplemental Appendix at 414 (affidavit of Frank Ovaitt).[3] Furthermore, as we noted above, the classic image of pollution in that era was the steady emission of pollutants into the air or a stream, not the kind of ground contamination that CERCLA and parallel developments made crucial. See, e.g., J.A. 2128, 2174, 2176 (script of speech delivered November 11, 1965 by the Secretary of the Hartford Insurance Co., entitled "Implications of Coverage for Gradual Injury or Damage" (1965)) (using, as an illustration of gradual harm, "the discharge of corrosive material into the atmosphere or water courses"). Against this backdrop, the insurers' statement that damages from pollution tended to be expected or intended and thus exempt from coverage under standard occurrence policies seems entirely plausible. While the expansion of liability for environmental harm in subsequent decades may have greatly increased the scope of "pollution damages" and reduced the likelihood of such damages being expected or intended, these later developments cannot convert the insurers' 1970 statements into misrepresentations.

Charter likewise fails to show how an internal statement by Aetna's in-house counsel, expressing reluctance to concede any reduction in coverage as a result of the pollution exclusion, supports the conclusion that the insurers' representations to regulators were deceptive. The counsel stated that Aetna did not want to concede any reduction in coverage as a result of the exclusion "because this is tantamount to admitting that all such cases are now covered, whereas some of them may not be covered." J.A. 5060. Though the meaning is obscure, it appears quite consistent with the insurers' position that the language change was one of clarification. Charter also points to a statement by the Aetna counsel that "[t]here may be a hue and cry because there will be no reduction in premi-

um, despite the fact that coverage would appear to be cut back...." *Id.* This statement appears in a list of "industry public relations" issues related to the filing of the pollution exclusion, and it is immediately followed by the statement that Aetna did not want to concede any reduction in coverage. Charter has not explained how an industry public relations concern about coverage "appear[ing]"—most plausibly to insurance regulators or policyholders—to be cut back is inconsistent with the representation of the exclusion as a "clarification" of existing coverage. Further, no premium reduction would have been likely for a linguistic change "for an exclusion where there was little or no loss experience" because of the limited scope of pollution liability at the time the exclusion was developed. Ovaitt Affidavit, Supplemental Appendix at 414.

Charter points finally to statements appearing in what it calls "insurance industry" publications, such as an item in the May 1971 issue of *F.C. & S. Bulletins.* See J.A. 2136, 2425–26. Without some reason to believe that any of the defendants is responsible for these statements—and Charter provides none—they appear to be only the view of some third party. Even if they provided an unequivocal reading of the pollution exception—and they don't—Charter does not explain why we should regard them as material.

Closely related to Charter's latent ambiguity contention is its argument that the insurers' statements to regulators require the court to strike down the exclusion (as interpreted in *General Dynamics*) on grounds of public policy. The district court rejected Charter's argument, relying again on *General Dynamics,* which the district court described as "implicitly reject[ing]" an analogous argument explicitly made by the insured in that case. *Independent Petrochemical Corp.,* 842 F.Supp. at 582. But since the *General Dynamics* court did not explicitly address the public policy argument, it cannot

**3.** In Addendum E to its Reply Brief, Charter characterizes the Ovaitt affidavit as "not made under oath." We are unable to explain this characterization, since the affidavit includes a notarization saying that it was sworn to before the notary. Charter also notes that Ovaitt did not join the Missouri Insurance Division until 1971, after the pollution exclusion had been filed. Reply Brief at 6 n. 5. However, this fact has no bearing on Ovaitt's ability to testify to the general tenor of pollution liability in the early 1970s.

clearly be said to have made a "reasoned inquiry" into Missouri law on the subject, as required for deference under *Abex.* See 790 F.2d at 125.

Charter has not pointed to any articulated policy of the Missouri legislature or the Missouri courts calling for judicial invalidation of contracts on the type of grounds urged by Charter, i.e., alleged misconduct of insurers before state regulators, as opposed to a substantive conflict between state public policy and a contract's terms. It is conceivable, of course, that Missouri courts would accept such a theory. We find it unnecessary to decide whether they would as a general matter, however, because Charter has failed to establish any convincing inconsistency between the representations and the language of the pollution exclusion as interpreted in *General Dynamics.*

### B. *"Suddenness" of Bliss's Discharge.*

■ Because the pollution exclusion as interpreted in *General Dynamics* denies coverage unless the discharge of pollutants is abrupt, we must determine whether Bliss's discharge of dioxin-contaminated oil satisfied this requirement. Clearly, if the discharge is defined as the aggregate of Bliss's oil-spraying activities, then it was not abrupt; Charter concedes that the spraying took place over a period of at least two months. It argues that each spraying session, taking about 30–40 minutes, should be viewed as a distinct discharge, and that, so viewed, the discharges were abrupt. The logical consequence of this argument, however, is that spraying in, say, 30–minute increments over a two-month period with five-minute breaks between each increment would satisfy the suddenness requirement, whereas constant spraying over the same two-month period would not. We cannot conceive of any sensible basis for such a distinction. As Charter itself acknowledges, see Reply Brief at 17–18, the rationale for excluding coverage when the polluting activity is undertaken repeatedly in the course of ordinary business operations is that the resulting harm is less likely than otherwise to be unexpected and unintended. Cf. *Lumbermens Mutual Casualty Co. v. Belleville Indus. Inc.,* 938 F.2d 1423,

1427 (1st Cir.1991) (describing discharges of toxic material over period of years as "not clearly beyond the long-range reasonable expectation of the insured"). As our discussion of moral hazard above suggests, suddenness serves as a proxy for harm that is truly unexpected and unintended, and the presence or absence of periodic breaks in an activity occurring over an extended period has little or no bearing on that likelihood. Thus we see no basis for disaggregating the spraying sessions.

As noted above, suddenness is only a proxy for harm that is unexpected and unintended, and here Charter presumably neither expected nor intended the harm that resulted from Bliss's spraying. Again, however, the inevitable imperfections in a proxy's fit are no basis for refusing to apply it. Thus we conclude that Bliss's discharge of dioxin-contaminated oil was not "sudden."

### C. *Coverage under the Travelers Policies.*

■ As we mentioned at the start, the policies issued by defendant Travelers did not contain the "sudden and accidental" language but instead preserved coverage for discharges that were neither "expected" nor "intended." As to those policies the duration of Bliss's spraying activity does not bar coverage. Rather, Charter should recover if the discharge of the dioxin-contaminated oil was neither expected nor intended. The district court treated this requirement as identical to the "accidental" requirement in the other policies, *Independent Petrochemical Corp.,* 842 F.Supp. at 577, 584–85 & n. 14, and Charter does not dispute that characterization on appeal.

■ The district court ruled that Bliss's discharge was not accidental, 842 F.Supp. at 584–85, citing significant case authority in support of that view, though no cases from Missouri itself. Charter did not dispute the district court's ruling in its opening brief, and, perhaps as a result, the defendants' briefs devoted only fairly limited attention to the issue. Charter's reply brief addressed the issue quite seriously, arguing that the discharge was accidental under Missouri law because Bliss was unaware that the material he was discharging contained dioxin. Even

then, Charter was unable to adduce any Missouri case from which its proposed conclusion would follow inescapably. Because Charter's strategy may well have "sandbagg[ed]" the insurers by denying them any chance to respond to the specifics of Charter's argument, see *Corson & Gruman Co. v. NLRB,* 899 F.2d 47, 50 n. 4 (D.C.Cir.1990), we deem the issue waived. See also *McBride v. Merrell Dow & Pharmaceuticals, Inc.,* 800 F.2d 1208, 1210–11 (D.C.Cir.1986) (similar); *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.").

## II.

There remain a few procedural matters to be cleaned up. After the parties had filed their briefs with this court, but prior to oral argument, the insurers filed a motion to strike certain exhibits submitted with Charter's reply brief. Charter fired back with a cross-motion to strike certain affidavits submitted by the insurers to the district court after briefing on the insurers' summary judgment motion was complete. We deferred consideration of these motions pending oral argument.

The insurers moved to strike the following material submitted by Charter: (1) deposition excerpts from unrelated litigation in other courts; (2) excerpts from insurance law treatises; (3) articles containing factual material concerning the drafting history of the pollution exclusion; and (4) a summary categorization, prepared by Charter, of affidavits submitted by the insurers to the district court.

■■ The deposition excerpts submitted by Charter were not put before the district court on the motion for summary judgment and therefore cannot properly be invoked here. See *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1035–36 (D.C.Cir.1988). The same is true of factual assertions in the

articles submitted by Charter. *Id.* On the other hand, we see no basis for any objection to submission of the articles and the excerpts from insurance law treatises as legal authority. See *Chicago Mercantile Exchange v. SEC,* 883 F.2d 537, 541–42 (7th Cir.1989) ("The [report submitted by one side] is a public document, which the court would be free to consult whether or not anyone had supplied it; lodging simply reduces the workload of the court's librarian.") Similarly, we see no problem with Charter's summary categorization of the insurers' affidavits, as it was essentially argument to this court (inaccurate in some regards, to be sure, see note 3), and Charter's reply brief fell comfortably short of our word limit. See D.C.Cir.R. 28(a).

As to Charter's objections to affidavits submitted by the insurers, only the affidavit of Frank Ovaitt (Supplemental Appendix at 414) has played any role in our affirmance of the district court's decision. We see no basis for any objection to the Ovaitt affidavit. See note 3 *supra.* Because we do not rely on any of the other affidavits, we need not address Charter's objections to them.

■■■ Charter also objects to discovery rulings entered by the district court in 1993 and by a magistrate judge in 1986 and 1987. We review district court rulings on discovery matters solely for abuse of discretion, *Carey Canada, Inc. v. Columbia Casualty Co.,* 940 F.2d 1548, 1559 (D.C.Cir.1991), and Charter has offered no serious argument that the district court's 1993 decision was "clearly unreasonable, arbitrary, or fanciful," *id.* (internal quotation marks and citation omitted). As to the magistrate judge's 1986 and 1987 rulings, we do not reach the merits of Charter's objections because we conclude that its failure to raise these objections in district court precludes it from raising them here. Under the version of Rule 72(a) of the Federal Rules of Civil Procedure in effect at the time of the magistrate judge's rulings, objections to such rulings were to be considered by the district court if filed within ten days of entry of the magistrate judge's order.[4]

---

**4.** Rule 72(a) now provides further that "a party may not thereafter assign as error a defect in the

magistrate judge's order to which objection was not timely made." We have held that under this

The majority view among courts interpreting this language or the statutory counterpart to Rule 72(a), 28 U.S.C. § 636(b)(1)(A), was that a failure to object to a magistrate judge's ruling barred review of that ruling on appeal, either because the failure to object waived the claim or because the court lacked jurisdiction over the magistrate judge's order. E.g. *Merritt v. International Bhd. of Boilermakers,* 649 F.2d 1013, 1019 (5th Cir.1981) (waiver); *Whitehead v. Califano,* 596 F.2d 1315, 1319 n. 3 (6th Cir.1979) (lack of jurisdiction); *United States v. Reeds,* 552 F.2d 170, 171 (7th Cir.1977) (lack of jurisdiction); but see *U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1102 (9th Cir.1985) (rejecting waiver and lack of jurisdiction contentions). The majority view appears a sound inference from the rule's language and bars review of Charter's objections to the magistrate judge's 1986 and 1987 discovery rulings.

\* \* \*

The district court's grant of summary judgment for the defendants is

*Affirmed.*

language we lack jurisdiction over challenges to magistrate judges' orders to which objection was not timely made below. *CNPq–Conselho Nacional de Desenvolvimento Cientifico e Technologico v. Inter–Trade, Inc.,* 50 F.3d 56, 57–59 (D.C.Cir. 1995).